646 F.2d 1064
 ST. PAUL FIRE & MARINE INSURANCE COMPANY and Boston
Insurance Company, Plaintiffs,
v.
COMMODITY CREDIT CORPORATION, United Farmers Marketing Assn.
and George Cochran, Defendants,
UNITED STATES of America, Counterplaintiff-Appellant,
v.
ST. PAUL FIRE & MARINE INSURANCE COMPANY and Boston
Insurance Company, Counterdefendants-Appellees.
 No. 78-3537.
 United States Court of Appeals,
Fifth Circuit.
 June 4, 1981.
 
 Leonard Schaitman, Appellate Staff, John F. Cordes, Civil Div. Dept. of Justice, Washington, D. C., for counterplaintiff-appellant.
 Marian Mayer Berkett, New Orleans, La., Donald M. Hunt, Lubbock, Tex., for St. Paul Fire & Marine Ins. Co.
 Appeal from the United States District Court for the Northern District of Texas.
 Before ALVIN B. RUBIN, HENDERSON and REAVLEY, Circuit Judges.
 HENDERSON, Circuit Judge.
 
 
 1
 Our task in this appeal is to review the decision of the district court that two sureties, St. Paul Fire & Marine Insurance Company (St. Paul) and Boston Insurance Company (Boston) were released from their obligations on certain bonds because of the actions of the creditor, Commodity Credit Corporation (CCC). The duties arising from these bonds are at issue. The trial court held that St. Paul was released on its September, 1963 and January, 1964 bonds and Boston was relieved on its January, 1964 bond when CCC condoned impairment of collateral in which the sureties would have an interest by virtue of subrogation to CCC's rights as creditor of United Farmers Marketing Association (UFMA). As additional grounds for discharge on bonds that each surety issued in January, the court concluded that they were invalid because 1) the loss occurred prior to their issuance; and 2) the creditor failed to inform the sureties of an unknown material risk at the time the bonds were issued.[1] The trial judge also determined that if there was liability CCC could not recover prejudgment interest and the sureties would be entitled to certain offsets. On appeal, the government urges us to disregard the district court's findings of fact as merely mistaken legal inferences and to reverse the judgment in favor of the sureties as a matter of law.
 
 
 2
 The facts, as correctly articulated on the first appearance of this case in our court, are as follows:
 
 
 3
 "St. Paul Fire & Marine Insurance Company (St. Paul) and Boston Insurance Company (Boston) sued Commodity Credit Corporation (CCC) seeking a declaration of no liability on three bonds assuring performance by United Farmers Marketing Association (UFMA) of its obligations under a 1963 Cotton Cooperative Loan Agreement executed between UFMA and CCC. St. Paul and Boston were sureties on the three bonds; UFMA, an agricultural cooperative organized in Lubbock, Texas, was the principal; and CCC was the obligee. CCC counterclaimed for $265,000.00, the aggregate face amount of the three bonds, charging that UFMA's failure to redeem 3,421 bales of cotton, released to UFMA under trust receipts, was a breach of the 1963 Agreement. By answer St. Paul and Boston denied liability on the principal grounds that they guaranteed only performance of the 1963 Loan Agreement and that UFMA's failure to redeem was a breach of the trust agreement, not the 1963 Loan Agreement. The sureties also interposed additional so-called 'affirmative' defenses. The district court found that (the) sureties guaranteed only performance of the 1963 Loan Agreement, that UFMA's failure to redeem was a breach of the trust receipt agreement under which the bales were released to UFMA, and that the rights and duties created by the trust receipt agreement were not incorporated by reference into the 1963 Loan Agreement. Since it found the sureties' primary defense a good one, the court did not consider the 'affirmative' defenses. Accordingly, the District Court ruled that CCC take nothing on the counterclaim and granted (the) sureties their requested declaratory relief
 
 
 4
 The Commodity Credit Corporation is an administrative agency of the United States created by Congress '(f)or the purpose of stabilizing, supporting, and protecting farm income and prices, of assisting in the maintenance of balanced and adequate supplies of agricultural commodities and of facilitating the orderly distribution of agricultural commodities.' As pertinent to this appeal, CCC effectuates cotton price supports by making nonrecourse loans to individual cotton producers in accordance with 7 U.S.C. § 1425, taking cotton as security The cotton is stored in approved commercial warehouses, which issue warehouse receipts against the bales. When the loan matures the farmer may elect to pay the debt and redeem the cotton. Alternatively, since CCC's only recourse is against the collateral, the farmer may allow the cotton to pass to CCC upon loan maturity and retain his loan proceeds. The government explains that if cotton prices rise above the loan level, the farmer usually will market the cotton and realize the profit. If cotton prices fall he simply does not redeem the cotton. Thus the farmer is assured as a minimum the loan value for his cotton.
 
 
 5
 Individual cotton producers may combine their resources to enhance profits by forming marketing associations as authorized by the Capper-Volstead Act § 1, 7 U.S.C. § 291 For example, an individual producer may elect to tender to the association his warehouse receipts, which evidence cotton stored in approved commercial warehouses, and the association will promptly pay the producer for his receipts the loan value of his cotton. The association then uses the receipts as collateral for CCC-sponsored loans
 
 
 6
 As the parties point out, until maturity of the loan the individual producer, or the association in appropriate cases, has an equity interest in the cotton that secures the loan
 
 
 7
 The sale of equity interest by the association was, at least in 1963-64, accomplished in practice by use of trust receipts. CCC would release in trust to the association the warehouse receipts held as loan collateral. The terms of the trust were set out in the trust receipts, which provided in pertinent part:
 
 
 8
 "(T)he (association) agrees to hold said warehouse receipts and any proceeds therefrom in trust for Commodity Credit Corporation and further agrees to return said warehouse receipts to the bank within 15 days after the date hereof (or such extension of time as may be granted by the Director the New Orleans ASCS Commodity Office), unless the (association) has redeemed the cotton represented by said warehouse receipts in accordance with Section 12 of said Loan Agreement
 
 
 9
 The intention of this arrangement is to protect and preserve, unimpaired, the lien of Commodity Credit Corporation on said warehouse receipts as security for the obligations of the (association) under said loan agreement."The proceeds realized by the association on the sale of the warehouse receipts would be forwarded to CCC to liquidate the loan and relieve the collateral from trust
 
 
 10
 Section 12 of the Agreement is central to this appeal. Tracking the regulatory scheme, § 12 specifies UFMA's right to redeem collateral prior to loan maturity:
 
 
 11
 "12. Redemption of Loan Collateral. Prior to maturity of the loan indebtedness as provided in section 17, the association shall have the right to redeem all or any part of the cotton upon payment to CCC of the loan indebtedness with respect to such cotton as set forth in section 5 hereof, less a fee of 15 cents per bale or accrued interest, whichever is less "
 
 
 12
 Section 12 further sets out the association's obligations in the event it sold its equity interest prior to redemption of the collateral:
 
 
 13
 "If the Association sells or permits its members to sell their interest in any cotton pledged to CCC hereunder, it shall redeem such cotton within 15 days from the date of such sale."
 
 
 14
 Finally, § 12 concludes by referring to the trust receipt method of effecting sale of the association's equity interest:
 
 
 15
 "CCC may, if it deems it desirable, release warehouse receipts to the Association against trust receipts acceptable to CCC."
 
 
 16
 Section 10 of the Agreement required the association to furnish a bond guaranteeing that the association would fully discharge all its obligations under the Agreement. Accordingly, UFMA secured from St. Paul and Boston broadly worded performance bonds in the aggregate face amount of $265,000. These bonds were substantively identical and provided in pertinent part:
 
 
 17
 "WHEREAS, the principal has entered into a 1963 Cotton Cooperative Loan Agreement with CCC dated September 10, 1963 under which CCC has undertaken to make loans on cotton to the principal in accordance with the terms and conditions of that Agreement; and
 
 
 18
 WHEREAS, the principal is required by the terms of that Agreement to discharge certain obligations in connection with such cotton:
 
 
 19
 NOW THEREFORE, the condition of this obligation is such that if the principal shall fully and completely discharge all obligations to CCC required by the said 1963 Cotton Cooperative Loan Agreement, or any amendment thereto heretofore or hereafter made, then this obligation to be null and void; otherwise to be and remain in full force and effect.
 
 
 20
 PROVIDED, HOWEVER, that this bond is executed upon the following express conditions:
 
 
 21
 (1) This bond shall cover only these obligations of the principal arising under the said 1963 Cotton Cooperative Loan Agreement or any amendments thereto heretofore or hereafter made, which arise during (a specified period).
 
 
 22
 (2) No extension of time or other waiver or amendment of the terms and conditions of the 1963 Cotton Cooperative Loan Agreement granted to the principal by CCC shall relieve the surety from its obligations hereunder, and the surety waives notice of any such extension, waiver, or amendment."
 
 
 23
 In accordance with the 1963 Loan Agreement, UFMA tendered cotton to CCC for loans and CCC released warehouse receipts in trust to UFMA. The value of warehouse receipts released to UFMA in trust during the 1963 season was approximately $54 million. For a month or so after the parties executed the September 1963 Agreement, UFMA functioned smoothly. In December 1963, however, CCC learned through standard periodic investigations that UFMA was experiencing trouble redeeming cotton collateral sold by UFMA, and that some trust receipts had been outstanding for more than 15 days. CCC was advised that UFMA did not have sufficient funds both to redeem cotton and to cover producer drafts of its individual members. CCC then directed the First National Bank of Lubbock, which was acting as UFMA's servicing agent, to use available proceeds to cover producer drafts. To allow UFMA to rehabilitate itself, CCC officials waived the 15-day redemption requirement, and, at the same time suspended UFMA's trust receipt privileges.
 
 
 24
 While the December crisis raised the spectre of financial instability, CCC's ensuing investigations revealed that UFMA's problem was caused by administrative delays in processing warehouse receipts tendered to CCC by individual producers. In short, UFMA had been paying individual producers for their warehouse receipts more rapidly than it had been obtaining loan proceeds from CCC. At any rate, by December 30, 1963, UFMA had sufficient funds to redeem the cotton, and trust receipt privileges were resumed.
 
 
 25
 The second crisis came the following April. From March 27 through April 4, 1964, CCC released to UFMA, in trust, warehouse receipts evidencing 3,421 bales of cotton which had a loan value of $500,103.08. Upon receiving the warehouse receipts UFMA sold its interests in this cotton, but it did not redeem the collateral within 15 days of sale. Hindsight now shows that UFMA had been kiting its obligations i. e. using proceeds of new loans to meet old obligations. The kite's string ran out, in this case, with trust receipts covering the 3,421 bales in issue. By April 7, it was obvious that UFMA had no funds with which to redeem the 3,421 bales. CCC duly notified UFMA and sureties that UFMA was in default of its obligations and demanded payment. UFMA failed to redeem the collateral, and the sureties have refused to indemnify CCC for its loss." (Citations and footnotes omitted, emphasis added).
 
 
 26
 St. Paul Fire & Marine Insurance Co. v. Commodity Credit Corp., 474 F.2d 192, 193-97 (5th Cir. 1973), on remand, aff'd on other grounds.
 
 
 27
 After the first panel decided that the bonds did secure indebtedness arising from the trust receipt procedure as incorporated within the Loan Agreement, the case was remanded to the district court for a determination of the sureties' affirmative defenses. St. Paul and Boston vigorously asserted that their responsibilities under the bonds were dissolved when CCC consented to and directed dissipation of the trust receipt collateral. While discharge of a surety resulting from the impairment of collateral is usually pro tanto, in this case, the loss was so great that the sureties claimed complete exoneration. Allegedly, impairment resulted when CCC permitted use of trust receipts proceeds from later loans to redeem the cotton securing earlier loans and when UFMA, with the knowledge of CCC, comingled trust receipts proceeds with funds disbursed through its general expense account.[2]
 
 
 28
 Two more points were made by the sureties with respect to the surety bonds issued in late January. St. Paul and Boston asserted that the loss occurred prior to issuance of the bonds and, hence, was not within the temporal scope of their coverage. The sureties cited 10 Williston on Contracts, § 1249 (1961) as authority for the additional proposition that CCC's failure to inform the sureties of facts not known to them that materially increased the risk assumed amounted to a discharge of the sureties. Thus, even if the loss was within the time frame of the bond, CCC's nondisclosure of the enhanced risks created by the December shortage purportedly absolved the sureties of liability on the January bonds.
 
 
 29
 Fifty-six more findings of fact were enumerated by the trial judge following his second review of the case in which he considered the preceding affirmative defenses. As we examine these findings of fact, we are urged by the appellant to abandon Fed.R.Civ.P. 52(a)'s "clearly erroneous" standard of review. Instead the appellant would have us characterize many of the 56 "factual" findings as legal inferences which we are free to discard as induced by misapprehensions of the law, if, after a broad examination, it is determined that they are incorrect. Factual conclusions, or conclusions reached in mixed questions of law and fact, that are grounded on inaccurate legal standards do not have the Fed.R.Civ.P. 52(a) "clearly erroneous" protection. Shultz v. First Victoria National Bank, 420 F.2d 648, 654 n. 10 (5th Cir. 1969) citing United States v. Singer Manufacturing Co., 374 U.S. 174, 83 S.Ct. 1773, 10 L.Ed.2d 823 (1963). But if a decision is correct on the law, then, when a mixed question of law and fact is divided into its component parts, the factual findings must be upheld unless "clearly erroneous" and the legal conclusions are reversed only after an extensive review if incorrect. Buchanan v. United States Postal Service, 508 F.2d 259, 267 n. 24 (5th Cir. 1975).
 
 
 30
 We think that of the district court's 56 findings, those to the extent paraphrased below are factual determinations to which the "clearly erroneous" standard applies.[3] Furthermore, we will not disturb these findings, because they are substantiated by evidence in the record, as follows:
 
 
 31
 1. Insofar as the January bonds are concerned, CCC knew St. Paul's identity as a possible surety because St. Paul had issued the first bond in September. CCC knew that Boston would be a surety because Boston sent a binder letter to that effect to CCC five days before assuming the obligation. (Findings of Fact $ 4, 5).[4]
 
 
 32
 2. Both sureties indicated their reliance on CCC to inform them of UFMA's financial condition by placing provisions in the bonds which stated, "The surety will promptly be advised by CCC of any default by the principal." (Findings of Fact $ 7).[5]
 
 
 33
 3. The cotton sale proceeds were not held in trust as required by the terms of the trust receipt. Instead, the funds were deposited into the one general cotton account maintained by UFMA from which it paid all indebtedness, including operating expenses. (Findings of Fact $ 17, 19, 31, 36).[6]
 
 
 34
 4. At the time the warehouse receipts were released, the CCC knew that UFMA intended to sell the cotton and use the proceeds of the sales for purposes other than redeeming the particular outstanding loan secured by the receipt.
 
 
 35
 Section 12 of the Loan Agreement allowed redemption of cotton only "upon payment to CCC of the loan indebtedness with respect to such cotton." (Emphasis added). Particular cotton was given as collateral for a particular loan. (Findings of Fact $ 8, 20, 25, 28, 29).[7]
 
 
 36
 5. On December 13, 1963, the CCC director actually instructed the bank to pay farmers drafts against UFMA with funds generated by the sale of trust receipt cotton. This direction was an immediate diversion of collateral.[8]6. When they agreed to be sureties neither St. Paul nor Boston anticipated that a trust receipt procedure which allowed diversion of capital would be permitted. (Finding of Fact $ 37).[9]
 
 
 37
 7. When the January bonds were issued neither surety knew of the December shortage. (Findings of Fact $ 44, 45).[10]
 
 
 38
 8. After the bonds were issued neither St. Paul nor Boston was informed that collateral was being released under procedures which allegedly permitted diversion of the collateral to other debts or loans and which allegedly materially increased the risk of the obligation. (Findings of Fact $$ 21, 43, 55).[11]
 
 
 39
 9. The massive diversion of collateral which began in December, 1963, was still in existence in February, 1964, and beyond. (Findings of Fact $ 38, 42).[12]
 
 
 40
 It is in light of these factual findings that we must ascertain the sureties' legal obligations under federal law which governs construction of the suretyship contracts between CCC, as creditor, and St. Paul and Boston. See St. Paul Fire & Marine Insurance Co. v. Commodity Credit Corp., 474 F.2d 192, 197 (5th Cir. 1973). As a means to order this analysis, we address, first, the nature of suretyship in general; second, the relationship of CCC and St. Paul on the first bond; and third, the relationship of CCC and the January bond issuers.
 
 
 41
 A surety is one who assumes secondary liability for the performance of an obligation; he agrees to pay if another does not. Nevertheless, as a general rule, the creditor, or obligee, to whom the surety's assurance is given is not bound to disclose to the surety unrequested information concerning the secured transaction. Anton Zverina Realty Co. v. Maryland Casualty Co., 67 F.2d 292, 294 (6th Cir. 1933). If a surety fails to seek important information that is available to him, he cannot, in the absence of fraud, assert as a defense ignorance of facts which he should have known and considered prior to the execution of the contract. The law does not favor the indifferent, unseeing surety who fails to help himself. Magee v. Manhattan Life Ins. Co., 92 U.S. 93, 98, 23 L.Ed. 699, 700 (1875). Unless the creditor is aware that the surety is mistaken as to the duty, or there is a request for information by the surety, or the bond is executed in the presence of someone associated with the creditor, a creditor cannot be charged with withholding information that could have been discovered by the surety. Id. at 99, 23 L.Ed. at 701.
 
 
 42
 In some respects, however, the suretyship bond is fragile, easily broken by the conduct of the creditor. The validity of the contract may be vitiated ab initio by the creditor's actions during its creation. A creditor who, during negotiations, actively and fraudulently conceals pertinent facts cannot then turn to the surety for reimbursement. Id. at 98, 23 L.Ed. at 700; Town of Hamden v. American Surety Co., 93 F.2d 482, 484 (2d Cir. 1937). Similarly, the surety has a defense to liability if, before the obligation is undertaken, the creditor knew of facts unknown to the surety and which he had reason to believe were not known to the surety, the facts materially increased the obligor's risk and the creditor had adequate time to disclose them but failed in his responsibility. Restatement of Security, § 124 (1941). So, for example, a party must be given actual or constructive notice of a custom that will vary the terms of the contract. St. Louis Southwestern Railway v. Garvey Elevators, Inc., 505 F.2d 625, 627 (5th Cir. 1974). Furthermore, assuming the suretyship agreement was initially enforceable, the creditor may thereafter lose the right to demand its coverage if he impairs any collateral to which the surety could look for reimbursement. United States v. Continental Casualty Co., 512 F.2d 475, 478 (5th Cir. 1975); Restatement of Security, § 132 (1941).
 
 
 43
 Nondisclosure of a material risk and fraud by concealment are not implicated in the issuance of the first St. Paul bond. The UFMA was a newly-created organization without a tainted credit record and the CCC had no disquieting facts to disclose to St. Paul. On the other hand, CCC's conduct with respect to the collateral after the bond was received fell far below the mean. UFMA's practice of repaying one loan with proceeds from the collateral securing another loan had the effect of stripping the second loan of its security. This persistent procedure impaired St. Paul's security. The comingled accounts also led to loss of collateral, because, as was inevitable, trust receipt proceeds were expended on totally unrelated general expenses. Although UFMA was the primary abuser of the collateral, it is a fact that CCC knew of the wrong and failed to halt it. The district judge's factual finding that CCC knew of the "kiting" practice is not "clearly erroneous"; CCC does not dispute this accusation. Indeed, the evidence shows that CCC expressly consented to UFMA's dealings when questioned about their acceptability by the bank. Under the proper legal standard, CCC's condonation of the practice was conduct which would discharge St. Paul from liability on the first bond.
 
 
 44
 In defense of its innocence, CCC says that industry custom permits trust receipt proceeds to be used in this unregulated manner. Ostensibly, "custom" becomes clothed with the mantle of legality when observed over time and, from the appellant's point of view, custom becomes known and accepted by lenders and sureties in the business. CCC maintains that St. Paul knew the loans would be paid off in this manner and therefore waived release by virtue of the alleged impairment.
 
 
 45
 We disagree with CCC. The trust receipt system itself was referred to in the bond and loan agreement of which we may presume St. Paul was aware. But the "kiting" practice actually allowed was in direct contravention of the loan agreement's command that the proceeds from each receipt be kept in trust for that loan. Custom cannot vary terms of an unambiguous contract which contained the obligations the surety agreed to assume, absent proof of actual or constructive notice of the custom. St. Louis Southwestern Railway v. Garvey Elevators, Inc., 505 F.2d at 627. We refuse to charge St. Paul with discovery of the true state of affairs, ascertainable only after an "extensive examination" of industry practices. Compare Town of Hamden v. American Surety Co., 93 F.2d at 487. Thus, the defense of impairment of collateral, which St. Paul has not waived by consent to a purported custom,[13] continues to be available against CCC and precludes recovery by the government on the first St. Paul bond.[14]
 
 
 46
 The defenses of St. Paul and Boston with respect to the January bonds focus on CCC's actions at the time the bonds were issued.[15] First, the sureties contend they have no responsibility for the loss caused by the "kiting" from December through April. Read together, several findings of fact by the district judge confirm that the date of initial loss was as early as December 13, 1963. This conclusion is not "clearly erroneous". Neither is the finding that UMFA's December insolvency condition was never fully alleviated by the escrowed monies.[16] The insurance companies are therefore released to the extent of the loss existing on the date the bond obligations became effective.[17] A surety insures performance of a contingent obligation; he is not a guarantor for an existing default.[18] Anton Zverina Realty Co. v. Maryland Casualty Co., 67 F.2d at 294. Accordingly, the previously existing portion of the outstanding debt is still owed by UFMA, but it is not secured by the bonds here in issue.
 
 
 47
 Yet another defense is asserted by the sureties to prevent enforcement of the January, 1964 suretyship obligations. By that time, UFMA had been in operation long enough to show its business ineptitude and to convince a reasonable person that the December losses were but a forecast of future defaults. This likelihood substantially increased the risk of the appellees. Because CCC knew of the December shortage and the two sureties did not and because CCC should have had reason to believe that the sureties would not have assumed the obligation if they had known all the circumstances, its failure to notify St. Paul and Boston of such a situation is a complete defense to liability on the January bonds. Restatement of Security, § 124 (1941). Among the facts that are material to a suretyship transaction is the financial condition of the principal. As an example, the Restatement cites a debtor's constant pattern of dilatory payments as a material omission of fact constituting constructive fraud on the surety. Furthermore, this Restatement section contemplates objective criteria of materiality of the facts not disclosed, not a subjective test of the intent of the creditor who fails to disclose. CCC's protestations that it did not "consider" the situation to exhibit material risks, because the cooperatives customarily have very poor earnings in the first few months, are irrelevant. At the time the contracts were executed, the CCC failed to disclose two facts objectively probative of material risk, the December shortage and the probability of future shortages. The sureties are completely released because CCC failed to disclose what was objectively material information. Compare Citizens State Bank v. American Fire & Casualty Co., 198 F.2d 57 (5th Cir. 1952); First State Bank v. New Amsterdam Casualty Co., 83 F.2d 992 (5th Cir. 1936).
 
 
 48
 Given our holding that the sureties are not liable on the bonds, we find it unnecessary to reach the assignments of error with respect to the contingent award of offset credits and denial of prejudgment interest. In all other respects the judgment of the trial court is AFFIRMED.
 
 
 
 [1]
 At the original trial and on the first appeal the sureties raised these issues as affirmative defenses which were independent of and alternate to their main argument that the trust receipt obligation breached by UFMA was not covered by the bonds. Although the affirmative defenses were not considered until remand, the enumeration of these defenses as presented to this court at that time was:
 (1) CCC's surrender and release of the pledged collateral deprived sureties of their right of subrogation and released sureties from their obligations under the bonds; (2) CCC's loss occurred prior to the time when Boston's bond and St. Paul's second bond became effective; (3) CCC failed to inform the bonding companies of the extraordinary risk of the defaults by UFMA before the last two bonds were written; (4) CCC failed to inform the bonding companies of defaults by UFMA after the bonds were written; (5) sureties were entitled to certain offsets in the event they are liable on their bonds.
 St. Paul Fire & Marine Ins. Co. v. Commodity Credit Corp., 474 F.2d 192, 199 (5th Cir. 1973).
 
 
 [2]
 The sureties also contend that collateral was dissipated in December, 1963, when the CCC waived the 15-day trust receipt redemption deadline to permit payment of the farmers' loan checks. As a practical matter, delayed repayment was not unusual; the first trust receipt remained outstanding longer than 15 days. Tr. at 422. CCC insists, however, that the language of the bond authorized it to waive the 15-day rule and relieved it of any duty to notify the sureties of the rectified default:
 No extension of time or other waiver or amendment of Loan Agreement will relieve the surety from its obligations hereunder, and the surety waives notice of such extension, waiver or amendment.
 The district court found as a matter of law that CCC's failure to give notice of the delinquencies which had been waived by CCC did not constitute a violation of the bonds, because CCC was permitted to extend the time for repayment without notice to the sureties.
 Because we decide the dissipation question on other grounds, we need not attempt a resolution of the problem of construction and application of this language.
 
 
 [3]
 These facts alone provide sufficient basis to review the trial judge's conclusions of law, so we expressly do not address the accuracy of the other findings
 
 
 [4]
 An affiliate of the Lubbock Insurance Agency, the company through which the St. Paul bond was obtained, testified that he sought verification from the First National Bank of Lubbock of a financial statement submitted by George Cochran of UFMA. The insurance agent apparently notified the bank that if the statement could be relied upon a performance bond would be issued covering UFMA. Disclosure to the bank, which was an agent of CCC, was equivalent to revealing its identity to CCC. Tr. at 447-50
 Boston Insurance Co., the other surety, approached CCC directly via a binder letter mailed before the bond was issued. Upon receipt of the letter, CCC was apprised of the fact that Boston would be a surety and CCC became obligated to communicate all material facts and material risks of which Boston was unaware. Tr. at 48-49, 193, 264.
 
 
 [5]
 It seems that during his sixteen-year experience in the insurance business this affiliate had never seen nor written a bond to cover a trust receipt operation. Tr. at 454. The trust receipt forms used by UFMA had been in nationwide service since 1959, but no form was attached to the documents received by the surety. Tr. at 180, 242, 250
 The sureties apparently relied upon the Lubbock bank for data on the transaction and on UFMA's financial well-being. Tr. at 454-58. No representative from the bonding companies approached CCC directly for information on UFMA. Tr. at 239.
 
 
 [6]
 Under the terms of the trust receipt "the undersigned agree(d) to hold said warehouse receipts and any proceeds therefrom in trust for Commodity Credit Corporation unless the undersigned has redeemed the cotton represented by said warehouse receipts in accordance with section 12 of said Loan Agreement." (Emphasis added.) Yet the record discloses that UFMA maintained only one general cotton account at the bank through which passed all trust receipt proceeds. Tr. at 38. It seems that comingling was a common practice with all cooperatives at that time. Tr. at 38, 248. UFMA did have a second account for expenses, but no deposits were made directly into that account. Tr. at 373. All proceeds were deposited into the general account which was used for all disbursements. Payments could be made from the expense account only after funds were transferred there from the general account. CCC knew that the proceeds were mixed in a general disbursement account rather than being held in trust. Tr. at 297-98, 416. On January 16, 1964, CCC demanded that a separate trust receipt account be set up by UFMA. Tr. at 177. No verification of compliance with this directive was made. Tr. at 351. In fact, a trust receipt account was never opened
 
 
 [7]
 The First National Bank of Lubbock was acting as an agent of CCC in granting trust receipt privileges to UFMA, thus the bank's knowledge is attributable to CCC. Tr. at 94. Evidently, the bank knew that UFMA's practice was to use sale proceeds to pay the oldest trust receipt debts first, rather than to apply the funds to the loan that was secured by the particular bale of cotton sold. Tr. at 374-75. CCC had informed bank officers that bale-by-bale replacement was unnecessary. Tr. at 181-82. Consequently, there is ample record evidence that CCC had both actual knowledge and constructive notice through its agent, the bank, that trust receipt proceeds were being used improperly for redemption purposes
 The CCC also had knowledge that some cooperatives allowed trust receipts to remain outstanding for longer than the 15-day maximum. In November, several cooperatives, including UFMA, were specifically investigated by Vick Peyton from the CCC office for trust receipt abuse. After the inspection, Peyton wrote a letter to CCC in which a Lubbock Bank official, Sterling Emens, is quoted as saying the whole UFMA deal "smelled". Tr. at 100-03. Emens predicted that money from the loans was being used by UFMA to operate in the interim between the time of the buying of the cotton and the presentation of the producer's draft. It was Emens' opinion that this "float" would decline in a crisis and exposure of the deficiency would occur during February, March or April of 1964. Tr. at 108, 110. Based on this statement, CCC had knowledge that financial catastrophe was a present and realistic possibility. It seems the bank's own hands were not clean; apparently it did not even keep trust receipt ledgers prior to the November visit. Tr. at 121-28.
 In spite of this problem, CCC chose to allow the continued "float" because, in the opinion of its officers, financial loss in the first three months of operation was to be expected. Tr. at 110.
 Although the trust receipt procedure was purportedly suspended until UFMA became current on its liquidation of the obligations, in point of fact some 2,655 bales were released on trust receipts during this moratorium period. Tr. at 137, 419.
 
 
 [8]
 Over 10,105 bales of cotton valued at $1.5 million had been sold and the proceeds deposited in the general account. Tr. at 132-33. Yet, at that time, UFMA's account balance was only some $800,000. Past-due trust receipts, i. e., those out longer than the 15-day period, totaled approximately that amount. Drafts to producers drawn on the account came to around.$1.8 million. Tr. at 129-30. When Emens asked the CCC director whether to apply those funds to the delinquent trust receipts or the producers' drafts, he was instructed to pay such drafts as he could. Tr. at 130. In fact, the bank apparently depleted the UFMA account and then applied its own fund to carry the balance of the drafts. Tr. at 131
 After an investigation, CCC announced that UFMA was having problems with its IBM processing, causing a backlog of warehouse receipts from its members for submission to the CCC. This situation apparently created a shortfall in UFMA's bank account. The CCC concluded that once the IBM backlog was cleared up, UFMA would again be able to timely meet its obligations. Tr. at 144, 169.
 
 
 [9]
 See notes 6 and 7, supra
 
 
 [10]
 Although a wholesale investigation of UFMA's practices was launched in December, the sureties were kept unaware of this inquiry in January. Tr. at 226, 453-54. During this period there was also a knowing overtender of cotton bales to UFMA of which the sureties were not informed. Tr. at 146-47. Furthermore, the sureties were asked to backdate their bonds to include this period during which, unbeknownst to them, the debtor had been unable to cover the very financial obligations they supposedly were to secure. Tr. at 171. The St. Paul bond was to have become effective on January 17, 1964, just several days after CCC recognized the need to demand that UFMA maintain two accounts. Tr. at 177. Boston's bond, executed in January, 1964, was to take effect retroactively to December 16, 1963, the next business day following UFMA's notice of the massive December 13th shortage. Tr. at 71-74
 
 
 [11]
 In April, 1964, the CCC notified the sureties that UFMA was in default on its obligation to CCC, but the sureties were never furnished with any details or particulars of that loss. Tr. at 461
 
 
 [12]
 CCC claims that the "law of the case" doctrine deprived the district court of authority to question the date of loss, because our first opinion made reference to the loss as occurring in April. St. Paul Fire & Marine Insurance Co. v. Commodity Credit Corp., 474 F.2d at 199. This court has held:
 The doctrine of 'law of the case' is a rule of practice under which a rule of law enunciated by a federal court 'not only establishes a precedent for subsequent cases under the doctrine of stare decisis, but ' is 'based upon sound policy that when an issue is once litigated and decided, that should be the end of the matter.' (Citations omitted.)
 Morrow v. Dillard, 580 F.2d 1284, 1289-90 (5th Cir. 1978).
 A determination that a "default" occurred on a given day would have been a conclusion of law. But, insofar as the first shortage is concerned, the law of the case doctrine did not prevent the district court from reaching the factual determination that UFMA could not pay all its debts on December 13, 1963, and that this inability was never fully cured. Moreover, the date of loss was not actually litigated in the first proceeding, and thus it should not be conclusive in this appeal even if it were considered to be a matter of law.
 
 
 [13]
 The record reflects that the Washington office had real concerns about the application of trust fund proceeds to other obligations of the cooperative. Tr. at 263. If such procedures were indeed customary, the practice was apparently a localized one
 
 
 [14]
 The culpable surrender or impairment of security by a creditor results in a pro tanto reduction in the sureties' obligations by the amount of the released collateral. Restatement of Security, § 132 (1941). Reduction is necessary so that, upon making payment of the bond, the surety can turn to collateral which will fully cover his disbursement. Since the trust receipt delinquencies soared to sums far in excess of the $100,000 St. Paul bond however, it is completely exonerated from that obligation
 
 
 [15]
 Because UFMA could be described as an ongoing enterprise in January, CCC presumably had more transactional information which it was under a duty to disclose at the time the January bonds were accepted. Rather than addressing CCC's impairment of the collateral allocated to the second bond transactions, the sureties accent CCC's alleged nondisclosures at issuance. Presumably nondisclosure is also emphasized because it gives rise to a complete defense, rather than a pro tanto defense
 The district court found that ongoing surrender of collateral released the sureties from their obligations under the January bonds, too. However, there is evidence that, by the time the second bonds were issued, CCC had attempted to protect the collateral by temporarily suspending trust receipt privileges in December and by requesting UFMA to set up a separate account for trust receipt proceeds. Although the facts may dictate a different result, we agree that the same legal principles with regard to dissipation of collateral that were applied to the first St. Paul bond are relevant here.
 
 
 [16]
 In December, 1963, UFMA placed.$1.8 million in escrow to cover its outstanding trust receipts. However, UFMA did not redeem the bulk of the cotton for which the escrow deposit was established until sometime after February 1, 1964. Tr. at 145, 478-79, 505-13
 
 
 [17]
 See note 10, supra
 
 
 [18]
 CCC maintains that no default existed in December, because it had waived UFMA's obligations to pay the trust receipt proceeds within 15 days of the release of the receipt. Under the terms of the transaction, CCC had the authority to waive the 15-day time limitation without notice to the sureties. However, UFMA was in "default" in the sense that it was unable to meet its obligations at a time when payment could have been demanded, even though the legal duty to pay was ultimately waived