**CAM–FUL INDUSTRIES, INC.,**
**Plaintiff–Appellant,**
**Cross–Appellee,**

v.

**FIDELITY AND DEPOSIT COMPANY OF MARYLAND, Defendant and Third–Party Plaintiff–Appellee, Cross–Appellant,**

Adams Electric Corp., Raymond R. Adams, Eleanor Adams and Robert M. Adams, Third–Party Defendants–Appellees, Cross–Appellants.

Nos. 1349, 1566 and 1567, Dockets 90–7113, 90–7169 and 90–7173.

United States Court of Appeals, Second Circuit.

Argued June 8, 1990.

Decided Jan. 4, 1991.

Ronald G. Robey (Smith, Currie & Hancock, D. Lee Roberts, Jr., Atlanta, Ga., of counsel), for plaintiff-appellant.

Gerald J. Mathews (Menter, Rudin & Trivelpiece, P.C., Jeffrey A. Dove, of counsel), Syracuse, N.Y., for defendant-appellee Fidelity and Deposit Co. of Maryland, and third-party defendant Adams Elec. Corp.

Before OAKES, Chief Judge, PRATT, Circuit Judge, and JOHN E. SPRIZZO, District Judge, for the Southern District of New York, sitting by designation.

GEORGE C. PRATT, Circuit Judge:

This dispute arises out of a public construction project in Syracuse, New York. We are asked primarily to reverse the district court's determination that relieved a surety of responsibility under a payment bond for the claim of an excavation subcontractor who, at the request of the prime contractor, installed wood sheeting that was required by the prime contract, but was beyond the scope of its subcontract. On this issue we reverse and remand for a determination of damages on the wood sheeting claim.

We also reverse the district court's *sua sponte* dismissal after trial, for lack of subject matter jurisdiction, of the reciprocal cross-claims between the third-party defendant prime contractor and the plaintiff subcontractor, and we dispose of other issues as indicated later in this opinion.

I. BACKGROUND

In early 1983 the City of Syracuse, New York, requested bids for rehabilitating the main electrical duct bank at the Syracuse Hancock International Airport ("the project"). Adams Electric Corp. ("Adams Electric"), a third-party defendant in this case, submitted the low bid of $590,630. The city's engineer for the project notified Adams Electric that its bid was more than 10 percent below the engineering estimate, and, as required by Federal Aviation Administration regulations, requested Adams Electric to review its bid. After checking with its proposed subcontractors and verifying its figures, Adams Electric, on May 16, 1983, entered into a contract with the city for construction of the project at the bid price.

As required by the contract, Adams Electric obtained from defendant Fidelity and Deposit Company of Maryland ("Fidelity") both a performance bond, not here in issue, and the labor and materials payment bond that is the subject of this appeal. Each bond was for the full contract price of $590,630, and each named Fidelity as surety and Adams Electric as principal.

Under the payment bond, the principal and the surety were "bound unto City of Syracuse, New York as Obligee, hereinafter called Owner, for the use and benefit of claimants" in the amount of the contract price. The condition of the bond's obligation was that Adams Electric should promptly make payments to all "claimants" for all labor and material used or reasonably required for use in the performance of the prime contract between Adams Electric and the city.

As a subcontractor of Adams Electric, plaintiff Cam–Ful Industries, Inc. ("Cam–Ful") qualified under the bond as a "claimant" and was therefore entitled to prompt payment from Adams Electric as principal, or in the event of Adams Electric's default, from Fidelity as surety, for labor and material "used or reasonably required for use in the performance of the Contract". Significantly for purposes of our review of the decision below, the "Contract" to which the bond refers is the prime contract between Adams Electric and the city, not the subcontract between Adams Electric and Cam–Ful.

Adams Electric subcontracted to Cam–Ful that part of the project's work that included excavating, protecting, and backfilling the long trench into which the airport's main electrical duct bank was to be placed. Prior to submitting its bid to the city, Robert Adams of Adams Electric met with Robert Bradley of Cam–Ful, and the two men walked the construction site with copies of the plans. At both ends of the trench, and at nine locations along its 3,000 foot length, electrical manholes were to be constructed. These manholes required excavations that were both wider and deeper than the normal trench section.

Standard considerations of safety require that whenever an excavation is made in the earth, some consideration be given to preventing the sides of the excavation from falling in during construction. On this project, Adams and Bradley considered two possibilities for that protection: open cut

trenching and wood sheeting. With the former technique, the sides of the excavation are sloped back so as to be self-supporting. With the wood sheeting technique, boards are driven into the ground to make a temporary wall along the sides of the excavation. Aided by cross-bracing, the boards then support the sides of the excavation during the work. While more secure, wood sheeting is considerably more expensive than open cut trenching because it requires more materials and labor.

In their preliminary discussions of this job, neither Adams nor Bradley was certain as to which type of protection the city's engineer would ultimately require on the project. Later, however, the two men agreed between themselves that wood sheeting would not be needed except in and near the manholes. At one meeting, when Bradley pointed out to Adams that the "typical trench section" shown on the plan appeared to call for wood sheeting, Adams reassured Bradley that it would not be necessary for the entire excavation, but only for the manholes.

On the basis of Adams's reassurance, Cam–Ful submitted a subcontractor's proposal to Adams Electric, which Adams Electric relied upon in making its successful bid to the city. Cam–Ful's proposal included wood sheeting for the manholes, but contemplated open cut trenching for the rest of the project.

Well after the prime contract had been awarded to Adams Electric, the project's engineer, on July 27, 1983, rejected the proposed excavation plan prepared by Cam–Ful, and indicated that the whole project, not just the manholes, would require wood sheeting. At this point Adams Electric had already signed its contract with the city and had obtained from Fidelity the performance and payment bonds; Adams Electric had not yet, however, executed any contract with Cam–Ful.

The district court found that despite the engineer's position on wood sheeting, "Bradley was being encouraged by Adams to continue on the Project"; that Adams suggested "that while tight wood sheeting might be the method of choice at the begin-

ning of the Project, that method would be changed fairly early in the Project"; and that "Adams also suggested that if tight wood sheeting were required throughout the Project, Cam–Ful would be paid for it". The district court further found that "[t]hese conclusions as to Adams' statements prior to the signing of the [sub]contract are uncontroverted".

Adams prepared a proposed subcontract, and on August 10, 1983, Bradley signed it after modifying the liquidated damages clause; he then returned the signed, modified subcontract to Adams. Bradley testified that he had modified the subcontract to reflect his understanding of his conversations with Adams regarding wood sheeting. He did this by crossing out the original liquidated damages clause and replacing it with the following language:

NO LIQUIDATED DAMAGES AS LONG AS WORK PROGRESSES AS FAST AS POSSIBLE AND ADAMS ELECTRIC DOCUMENTS PROJECT DELAYS BY JACK EASTERLY OF OCWA, WEATHER AND *UNFORESEEN CONDITIONS SUCH AS SHEETING ENTIRE TRENCH.* (emphasis added)

Adams noticed the modification and even spoke with an attorney about it before signing the modified contract. The district court found that Adams had testified "somewhat incredibly, that the modification did not 'raise any doubts' in his mind." It further found that Adams surely understood "that concerns about tight wood sheeting were paramount in Bradley's mind" and that Adams "certainly must have understood that his subcontractor [Cam–Ful] was not prepared or expecting to undertake tight wood sheeting of the entire project." The district court also concluded that "Adams undoubtedly understood that his signature bound him to the terms of the Subcontract." The only conclusion that can be drawn from these findings is that under the subcontract between Cam–Ful and Adams Electric, the price of $154,906 was not intended by either party to include wood sheeting beyond that needed for the manholes.

Eventually the project engineer did require that the entire excavation, including the trench, be reinforced with wood sheeting; this work was done, at Adams Electric's request, by Cam–Ful, which now seeks to recover an additional $316,444.97 for that work.

## II. PROCEEDINGS BELOW

Initially, Cam–Ful commenced arbitration with Adams Electric to resolve their disputes, including Cam–Ful's claim for additional work. While the arbitration was pending, Cam–Ful brought this action in the district court based on the payment bond, and it named Fidelity, the surety on the payment bond, as the only defendant. At a pretrial conference the district court suggested that the issues in the arbitration be brought into this action so that the entire dispute could be resolved in a single forum. The parties then entered into a stipulation withdrawing the arbitration, and providing for Fidelity to make a third-party claim against Adams Electric and its principals, based upon the indemnification agreement given upon issuance of the payment bond.

Adams Electric and Cam–Ful then asserted various cross-claims against each other: in addition to the $316,444.97 sought by Cam–Ful for the wood sheeting, Camful also sought additional compensation for extra dewatering and restoration work. Adams Electric raised claims for delays, additional engineering costs, and liquidated damages sought from Adams Electric by the city, as well as for delay and other damages sought from Adams Electric by Hogan, the other subcontractor on the job.

The entire matter was tried in a bench trial in the district court. In its final decision, the district court *sua sponte* raised a question as to its jurisdiction over the cross-claims between Adams Electric and Cam–Ful, (both of which are New York State corporations), and ultimately, the court dismissed the cross-claims for lack of jurisdiction. The district court then denied Cam–Ful's claim against Fidelity on the grounds that Cam–Ful's decision to install the wood sheeting without first notifying the surety constituted a modification of the subcontract, and this modification discharged the surety from liability for that work. In addition, the district court:

1. Denied, for failure of proof, the subcontractor's claim for extra work in dewatering the site;

2. Denied that part of the subcontractor's claim for extra restoration work that related to installing the wood sheeting, but allowed 15% of the claim relating to other extra restoration work; and

3. Allowed the subcontractor's claim for a balance due on the subcontract of $3,525.21.

Cam–Ful appeals the judgment; Fidelity and Adams Electric jointly cross-appeal the district court's decision to award Cam–Ful $6,343.65 for additional restoration work. They also cross-appeal the district court's decision that it lacked jurisdiction over Adams Electric's cross-claim against Cam–Ful.

We reverse the dismissal of the cross-claims; we reverse the denial of the subcontractor's claim for wood sheeting and of the related claim for restoration work; we affirm the denial of the dewatering claim; we affirm the determination of a balance of $3,525.21 due on the contract, but recognize that the sum may be changed after remand; and we remand for further proceedings.

Fidelity originally answered the complaint in 1985 through its attorneys, Hiscock & Barclay. Frequently in construction litigation, when the surety is fully indemnified by the principal, the attorneys for the principal take over defense of any action brought against the surety by a subcontractor. That happened here, and the firm of Menter, Rudin & Trivelpiece, P.C. served an amended answer on behalf of Fidelity. Although on its third-party complaint against Adams Electric, Fidelity was represented by Hiscock & Barclay, the Menter firm represented Adams Electric in its answer to Fidelity's third-party complaint and on the cross-claim against Cam–Ful.

Despite the apparent conflict of interest with the Menter firm representing both Fidelity in defense of Cam–Ful's claim, and Adams Electric in defense of Fidelity's third-party claim, there is no real conflict because Fidelity's liability to Cam–Ful is purely derivative from Adams Electric's liability to Cam–Ful, and any judgment to be paid by Fidelity to Cam–Ful would have to be reimbursed by Adams Electric and its guarantors, Raymond, Eleanor, and Robert Adams, under the indemnification agreement which forms the basis for the third-party complaint.

Both at trial and on appeal the Menter firm has represented both Fidelity and Adams Electric. All of the issues raised by the complaint, third-party complaint, and the cross-claims were fully litigated before the district court and presented for decision. Not until its final decision did the district court determine that it lacked jurisdiction over the cross-claims.

## DISCUSSION

### A. *Jurisdictional Issue.*

■ Without question, the district court correctly found there to be no diversity or other independent basis for federal jurisdiction over the cross-claims between Adams Electric and Cam–Ful. We think the district court erred, however, in failing to invoke its ancillary jurisdiction to adjudicate those claims. The district court viewed the cross-claims as "logically independent" of the main federal claim by Cam–Ful against Fidelity. We disagree.

Fed.R.Civ.P. 13(g) allows a party to "state as a cross-claim any claim * * * against a co-party arising out of the transaction or occurrence that is the subject matter * * * of the original action." A cross-claim does not need an independent basis for jurisdiction so long as it satisfies the test for ancillary jurisdiction. *See* 6 Wright, Miller & Kane, *Federal Practice and Procedure* § 1433 (1990). Under the doctrine of ancillary jurisdiction, the Supreme Court "has identified certain considerations which justified the joining of parties with respect to whom there was no independent basis of federal jurisdiction."

*Aldinger v. Howard,* 427 U.S. 1, 10, 96 S.Ct. 2413, 2418, 49 L.Ed.2d 276 (1976). These considerations—"judicial economy, convenience and fairness to litigants" *United ed Mine Workers of America v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966)—provide a satisfactory basis for jurisdiction over a nonfederal claim, provided, of course, that the claim satisfies the "common nucleus of operative fact" test set out in *Gibbs. See Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966).

The facts of this case offer a model for a federal court's proper exercise of its ancillary jurisdiction. The two groups of claims, one federal (based on diversity) and one nonfederal, are so tightly interwoven that the federal claims cannot be resolved unless the federal court also addresses the nonfederal claims. Moreover, all the claims arise out of a single construction project—the "common occurrence" requirement of *Gibbs.* Furthermore, the context in which the nonfederal claim is asserted, a "crucial" element according to the Court, *see Owen Equip. & Erection Co. v. Kroger,* 437 U.S. 365, 375–76, 98 S.Ct. 2396, 2403–04, 57 L.Ed.2d 274 (1978), also favors an exercise of ancillary jurisdiction in this case, since "ancillary jurisdiction typically involves claims by a defending party haled into court against his will, or by another person whose rights might be irretrievably lost unless he could assert them in an ongoing action in a federal court." *Id.* at 376, 98 S.Ct. at 2404. Such is the suit in this case.

In denying the cross-claims because they did not independently satisfy jurisdictional requirements, the district court failed to give proper weight to the other considerations underlying ancillary jurisdiction. Clearly, "Congress did not intend to confine the jurisdiction of federal courts so inflexibly that they are unable to protect legal rights or effectively to resolve an entire, logically entwined lawsuit." *Id.* at 377, 98 S.Ct. at 2404. This is such a lawsuit.

Cam–Ful was suing on Fidelity's payment bond. As a "claimant" under the

bond, Cam–Ful was entitled to recover only to the extent that it (a) had supplied labor and materials for work under the prime contract between Adams Electric and the city, and (b) had not been paid by Adams Electric. Cam–Ful's claim under the bond, therefore, was not only logically related to, but also inherently dependent upon the resolution of the cross-claims between Cam–Ful and Adams Electric. Fidelity's liability to Cam–Ful was derivative in nature and stemmed solely from Adams Electric's liability to Cam–Ful; therefore, resolution of the issues presented by Cam–Ful's complaint against Fidelity, over which there was unquestioned federal diversity jurisdiction, *necessarily* required determination of the cross-claims between Adams Electric and Cam–Ful.

On the remand, therefore, the district court should determine all of the cross-claims that were presented to it and fully briefed by the parties at trial.

B. *Cam–Ful's Wood Sheeting Claim.*

█ We agree with the district court's conclusion that the prime contract permitted the city's engineer to require that wood sheeting be used for the full length of the project. Under the prime contract, Adams Electric was, therefore, bound to provide the wood sheeting. Cam–Ful, however, was not bound to do the work. Its subcontract with Adams Electric was finally executed on August 10, 1983, and was based on Adams's assurances to Bradley, given to induce Cam-ful to execute the subcontract, that if wood sheeting were to be required for areas other than the manholes, Cam–Ful was to be paid for that work by Adams Electric. As a practical matter, if Cam–Ful had refused to do any wood sheeting or if it had refused entirely to enter into the subcontract because of the wood sheeting problem, then Adams Electric would have had to obtain another subcontractor who would, of course, have required reasonable compensation to do the wood sheeting work.

Fidelity's payment bond guaranteed payment for all work required by the prime contract, and this included a guarantee of payment for any wood sheeting required on the job. To the extent that Adams Electric may owe Cam–Ful additional money over and above the subcontract price, and if that additional amount is not "paid" as part of the resolution of the cross-obligations between Cam–Ful and Adams Electric, Fidelity will be liable to Cam–Ful under the payment bond.

The district court concluded that the understanding reached between Adams Electric and Cam–Ful about the wood sheeting, arrived at after execution of both the prime contract and the payment bond, was a "modification" of the subcontract, even though the subcontract had not yet been executed. The district court also concluded that this new understanding effectively modified the payment bond *ex post facto.* The court further viewed Cam–Ful's conduct as a failure to reveal to Fidelity facts which materially altered Fidelity's risk on the bond, a failure which precluded Cam-ful from recovering on the bond for its wood sheeting claim.

The district court referred to the general rule that discharges a surety from its bond obligation when the contract it has guaranteed has been materially altered. This rule, however, only applies to alterations of the prime contract, which was the situation in both cases upon which the district court relied: *United States v. Reliance Insurance Co.,* 799 F.2d 1382 (9th Cir.1986), and *Ramada Development Co. v. U.S. Fidelity & Guarantee Co.,* 626 F.2d 517 (6th Cir. 1980). To the extent that any "modification" or "alteration" took place in this case, however, it occurred at the subcontract level.

The district court asserted that Cam–Ful either should have refused to perform the wood sheeting or should have notified Fidelity of the "changed circumstances" between it and Adams Electric. Concluding that Cam–Ful was under an obligation to notify Fidelity of its arrangements with Adams Electric to treat wood sheeting as extra work, the district court also relied on *St. Paul Fire & Marine Insurance Co. v. Commodity Credit Corp.,* 646 F.2d 1064 (5th Cir.1981). That case, however, makes

it clear that "as a general rule, the creditor, or obligee, to whom the surety's assurance is given is not bound to disclose to the surety unrequested information concerning the secured transaction." *Id.* at 1072. Under this general rule Cam-ful would have no obligation to Fidelity, and while the rule has two exceptions, neither applies in this case. *See id.* at 1073.

A surety does not have to pay a claimant who "during negotiations, actively and fraudulently conceals pertinent facts", *id.*, nor is the surety liable if "before the obligation is undertaken, the creditor knew of facts unknown to the surety and which he had reason to believe were not known to the surety, the facts materially increased the obligator's risk and the creditor had adequate time to disclose them but failed in his responsibility." *Id.* at 1073. *See also State v. Peerless Ins. Co.*, 67 N.Y.2d 845, 848, 501 N.Y.S.2d 651, 653, 492 N.E.2d 779 (1986) (stating that a surety's "guarantee induced by fraudulent misrepresentation or concealment of a material fact is void") (citation omitted). The district court found no evidence of fraud on the part of Cam-Ful, nor was Cam-Ful privy to material information that was unknown to Fidelity before Fidelity undertook its payment bond obligation.

At the time that Fidelity agreed to furnish the payment bond for the contract, Cam-Ful was under the impression that wood sheeting would not be required under the prime contract. The bond between Fidelity and Adams Electric was signed on May 16, 1983; Cam-Ful did not sign its subcontract with Adams Electric until August 10, 1983. And even then, based on Adams's assurances, Cam-Ful believed that wood sheeting would not be required on the whole project.

The district court concluded that when Cam-Ful finally signed the subcontract, it knew that the project engineer was going to require wood sheeting. While that may be so, it is also true that Cam-Ful did not definitively learn of this requirement until *after* Fidelity had agreed to act as the surety on the prime contract. It may be that Fidelity was misled by Adams Electric.

But even if this were so, the burden of Adams Electric's transgression would not fall on Cam-Ful; rather, in this situation, "the surety bears the burden of making inquiries and informing itself of the relevant state of affairs of the party for whose conduct it has assumed responsibility." *Peerless Insurance Co.*, 67 N.Y.2d at 847, 501 N.Y.S.2d at 652, 492 N.E.2d at 780.

In allowing Fidelity to avoid its obligation to Cam-Ful, the district court believed that it was protecting the bidding process. According to the district court, "any other decision under the facts of this case would sanction an undermining of the bidding process and distort the policy behind requiring surety bonds in construction contracts." We disagree. "A surety is one who assumes secondary liability for the performance of an obligation; he agrees to pay if another does not." *St. Paul Fire & Marine Ins.*, 646 F.2d at 1072. Requiring a prime contractor to obtain a payment bond assures subcontractors that they will be paid for their work. The policy behind surety bonds is not to protect a surety from its own laziness or poorly considered decision. "A surety cannot 'rest supinely, close his eyes, and fail to seek important information,' and then seek to avoid liability under the guaranty by claiming he was not supplied with such information." *Mohasco Industries, Inc. v. Giffen Industries, Inc.*, 335 F.Supp. 493, 497 (S.D.N.Y. 1971) (citation omitted). *See also St. Paul Fire & Marine Ins.*, 646 F.2d at 1072 ("The law does not favor the indifferent, unseeing surety who fails to help himself.").

Cam-Ful did all that it could to avoid confusion about its responsibility: (1) Although the prime contract called for wood sheeting, Adams and Bradley both thought that the requirement probably could be changed; (2) Cam-Ful's price to Adams Electric did not include the cost of wood sheeting and Adams Electric was aware of this; (3) Cam-ful's subcontract with Adams Electric clearly regarded that wood sheeting as an "unforeseen condition" not contemplated by the subcontract; and (4) before commencing the wood sheeting, Cam-Ful was assured by Adams Electric that it would be paid for the work as an "extra".

Thus, it was Adams Electric, not Cam–Ful, that took what the district court concluded was a "calculated risk". Adams Electric knew that there was a possibility that the project engineer would insist on wood sheeting; it also knew that Cam–Ful in its subcontract price was undertaking no responsibility to install the wood sheeting. Adams Electric chose to risk the consequences of this potential discrepancy between the prime contract and the subcontract, and it was Adams Electric, not Cam–Ful, with whom Fidelity dealt and whose performance and payments Fidelity guaranteed.

Under New York law, it is well established that "[a] compensated, corporate surety * * * is not a favorite of the law and its contract of suretyship will be construed in a manner most favorable to a claimant." *Timberline Elec. Supply Corp. v. Insurance Co. of North America,* 421 N.Y.S.2d 987, 988, 72 A.D.2d 905, 906 (1979), *aff'd,* 52 N.Y.2d 793, 436 N.Y.S.2d 707, 417 N.E.2d 1248 (1980). The wood sheeting was required by the prime contract, for which Fidelity issued its payment bond; the sheeting was not required by Cam–Ful's subcontract, and was done by Cam–Ful only after Adams Electric agreed to fully compensate Cam–Ful for the extra work. In deciding to undertake this work, the only "calculated risk" Cam–Ful took was the same risk any subcontractor takes—that it will not be paid by the contractor. This risk is covered by Fidelity's bond, and Cam–Ful is entitled to be paid.

Because it disallowed any payment for wood sheeting, the district court did not address the merits of Cam–Ful's claim that the reasonable value of the extra work for installing the wood sheeting amounted to $316,444.97. In its cross-claim against Cam–Ful, Adams Electric contests that figure. On remand, the district court should determine the appropriate amount that Cam-ful should be paid for the "extra" wood sheeting installed beyond what Bradley and Adams originally agreed was required by the subcontract in and near the manhole areas.

**C. Cam–Ful's Dewatering Claim.**

After a thorough analysis of the evidence, the district court denied Cam–Ful's dewatering claim, because there was an "absence of creditable proof that a claim was submitted, or from which a determination of damages can be made". This conclusion is not clearly erroneous, and we affirm the district court's denial of this claim.

**D. Restoration Claim.**

Cam–Ful sought an additional $42,291 for restoration work not contemplated by the plans and specifications. After analyzing each component of the restoration claim and after excluding those portions that related to areas that had to be restored because wood sheeting was required, the district court allowed 15% of the claim. Except for the disallowance of restoration for the areas of extra wood sheeting, we find no error in the district court's findings or analysis. Since, however, we have determined that the wood sheeting claim is not precluded, the district court, on remand, will have to reexamine the restoration claim and allow an appropriate additional amount for any restoration work required by the extra wood sheeting that Cam–Ful installed for Adams Electric.

**E. Balance Due on Subcontract.**

The district court determined that $3,525.21 was the correct balance due from Adams Electric to Cam–Ful on the subcontract. Since on the remand the district court must adjudicate all of the cross-claims between Adams Electric and Cam–Ful and since it must, in addition, determine the amounts owed Cam–Ful on the wood sheeting and restoration claims, a new "balance" will have to be determined. We find no error, however, in the district court's findings as to the makeup of the $3,525.21 found to be due.

### IV. CONCLUSION

The judgment of the district court is reversed, the cross-claims are reinstated, and the case is remanded for further proceedings. Since the entire action was tried

and submitted for decision prior to the district court's concluding that it lacked jurisdiction over the cross-claims, all of the evidence needed to decide the issues in this case has already been presented, and the district court is not required to receive additional evidence or take further argument. It may, however, in its sound discretion take whatever further proceedings, including testimony, briefing, and oral argument, that will assist it in promptly and justly concluding this protracted litigation.