474 F.2d 192
 ST. PAUL FIRE AND MARINE INSURANCE COMPANY and Boston
Insurance Company, Plaintiffs,
v.
COMMODITY CREDIT CORPORATION et al., Defendants.
UNITED STATES of America, Counter Plaintiff-Appellant,
v.
ST. PAUL FIRE AND MARINE INSURANCE COMPANY and Boston
Insurance Company, Counter Defendants-Appellees,
 No. 72-2237.
 United States Court of Appeals,
Fifth Circuit.
 Feb. 15, 1973.
 
 Frank McCown, U. S. Atty., Fort Worth, Tex., Walter H. Fleischer, Judith S. Feigin, Dept. of Justice, Washington, D. C., for appellant.
 Marian Mayer Berkett, New Orleans, La., for Boston Ins. Co.
 Bernard P. Evans, Donald M. Hunt, Lubbock, Tex., for St. Paul Fire & Marine Ins. Co.
 James H. Milam, Lubbock, Tex., for 1st Nat. Bank.
 Charles B. Jones, Lubbock, Tex., for Cochran.
 Before GODBOLD, DYER and CLARK, Circuit Judges.
 GODBOLD, Circuit Judge:
 
 
 1
 St. Paul Fire & Marine Insurance Co. and Boston Insurance Co. sued Commodity Credit Corporation (CCC) seeking a declaration of no liability on three bonds assuring performance by United Farmers Marketing Association (UFMA) of its obligations under a 1963 Cotton Cooperative Loan Agreement executed between UFMA and CCC. St. Paul and Boston were sureties on the three bonds; UFMA, an agricultural cooperative organized in Lubbock, Texas, was the principal; and CCC was the obligee. CCC counterclaimed for $265,000, the aggregate face amount of the three bonds, charging that UFMA's failure to redeem 3,421 bales of cotton, released to UFMA under trust receipts, was a breach of the 1963 Agreement.[1] By answer St. Paul and Boston denied liability on the principal grounds that they guaranteed only performance of the 1963 Loan Agreement and that UFMA's failure to redeem was a breach of the trust receipt agreement, not the 1963 Loan Agreement.[2] The sureties also interposed additional so-called "affirmative" defenses. The District Court found that sureties guaranteed only performance of the 1963 Loan Agreement, that UFMA's failure to redeem was a breach of the trust receipt agreement under which the bales were released to UFMA, and that the rights and duties created by the trust receipt agreement were not incorporated by reference into the 1963 Loan Agreement. Since it found the sureties' primary defense a good one, the court did not consider the "affirmative" defenses. Accordingly, the District Court ruled that CCC take nothing on the counterclaim and granted sureties their requested declaratory relief. We find that UFMA's failure to redeem the cotton was a breach of the 1963 Loan Agreement, and reverse and remand for further proceedings.
 
 
 2
 A brief description of the cotton price support scheme is in order. We preface our remarks, however, with this caveat. Our description is not intended to be exhaustive. We confine our discussion to those aspects of the price support scheme revealed in the record, drawing also on explanations and references in the government's brief to which defendant sureties have not objected.[3]
 
 
 3
 The Commodity Credit Corporation is an administrative agency of the United States created by Congress "[f]or the purpose of stabilizing, supporting, and protecting farm income and prices, of assisting in the maintenance of balanced and adequate supplies of agricultural commodities . . . and of facilitating the orderly distribution of agricultural commodities." 15 U.S.C. Sec. 714. See Rainwater v. U. S., 356 U.S. 590, 591, 78 S.Ct. 946, 2 L.Ed.2d 996, 998 (1958). As pertinent to this appeal, CCC effectuates cotton price supports by making nonrecourse loans to individual cotton producers in accordance with 7 U.S.C. Sec. 1425, taking cotton as security. The loan value is geared to price schedules set out in 7 U.S.C. Sec. 1441. The cotton is stored in approved commercial warehouses, which issue warehouse receipts against the bales. When the loan matures the farmer may elect to pay the debt and redeem the cotton. Alternatively, since CCC's only recourse is against the collateral, the farmer may allow the cotton to pass to CCC upon loan maturity and retain his loan proceeds. The government explains that if cotton prices rise above the loan value, the farmer usually will market the cotton and realize the profit. If cotton prices fall, he simply does not redeem the cotton. Thus the farmer is assured as a minimum the loan value for his cotton.
 
 
 4
 Individual cotton producers may combine their resources to enhance profits by forming marketing associations as authorized by the Capper-Volstead Act Sec. 1, 7 U.S.C. Sec. 291. Recognizing the value to the individual producer of these marketing associations, CCC, pursuant to its regulatory authority, will make price support loans to an association. 7 C.F.R. Sec. 1427.1375 (1963). For example, an individual producer may elect to tender to the association his warehouse receipts, which evidence cotton stored in approved commercial warehouses, and the association will promptly pay the producer for his receipts the loan value of his cotton. See id. Sec. 1427.1375(c). The association then uses the receipts as collateral for CCC-sponsored loans. As in the case of individual producers the loan is nonrecourse, so the association may elect to allow the debt to mature without redeeming the collateral. If cotton prices rise, the cooperative may liquidate the debt and redeem and market the cotton. Profits are distributed to member producers on a cooperative basis.
 
 
 5
 As the parties point out, until maturity of the loan the individual producer, or the association in appropriate cases, has an equity interest in the cotton that secures the loan. If cotton prices are above the loan value, the producer's equity interest will roughly equal the difference between the loan principal plus interest and the cotton price. CCC regulations allow the producer to sell this equity interest without first redeeming the cotton. See 7 C.F.R. Sec. 1427.1373 (1963). For example, the producer may sell his equity by obtaining a Form AA, which the equity purchaser executes and returns to CCC. CCC then mails the appropriate warehouse receipts to a designated bank, which releases them to the equity purchaser upon payment of the loan principal plus interest. By this scheme a producer may in effect sell his cotton without first liquidating the loan. Thus a producer's inability to liquidate the loan will not prevent his realizing a gain from rising cotton prices.
 
 
 6
 The association may also sell its equity interest, although the mechanics for sale by it are not nearly so detailed in the regulations as the mechanics for sale by the individual producer. The pertinent regulation provides only:
 
 
 7
 [M]embers of . . . associations may act collectively in obtaining loans. The loan rates under this agreement will be the same as the loan rates to individual producers, and eligibility requirements with respect to the cotton and the producers tendering the cotton to the association and other loan provisions will be similar to those for loans to individual producers.
 
 
 8
 7 C.F.R. Sec. 1427.1375 (1963) (emphasis added). The sale of equity interest by the association was, at least in 1963-64, accomplished in practice by use of trust receipts. CCC would release in trust to the association the warehouse receipts held as loan collateral. The terms of the trust were set out in the trust receipts, which provided in pertinent part:
 
 
 9
 [T]he [association] agrees to hold said warehouse receipts and any proceeds therefrom in trust for Commodity Credit Corporation and further agrees to return said warehouse receipts to the bank within 15 days after the date hereof (or such extension of time as may be granted by the Director of the New Orleans ASCS Commodity Office), unless the [association] has redeemed the cotton represented by said warehouse receipts in accordance with Section 12 of said Loan Agreement.
 
 
 
 * * *
 The intention of this arrangement is to protect and preserve, unimpaired, the lien of Commodity Credit Corporation on said warehouse receipts as security for the obligations of the [association] under said loan agreement.
 The proceeds realized by the association on sale of the warehouse receipts would be forwarded to CCC to liquidate the loan and relieve the collateral from trust. As with the individual producer, then, the association could sell cotton collateral without first liquidating the loan. The major difference between sale by an individual producer and sale by an association was that the association acquired actual possession of warehouse receipts prior to sale, whereas the individual producer did not. Notably, this actual possession of receipts was the seed of this lawsuit.
 Against the backdrop of the price support scheme, we set out the facts of this case. CCC and United Farmers Marketing Association (UFMA) in 1963 executed a Cotton Cooperative Loan Agreement which permitted UFMA to obtain CCC-sponsored loans by tendering to CCC the warehouse receipts of co-op members. Section 12 of the Agreement is central to this appeal. Tracking the regulatory scheme, Sec. 12 specified UFMA's right to redeem collateral prior to loan maturity:
 
 
 [12]
 Redemption of Loan Collateral. Prior to maturity of the loan indebtedness as provided in section 17, the Association shall have the right to redeem all or any part of the cotton upon payment to CCC of the loan indebtedness with respect to such cotton as set forth in section 5 hereof, less a fee of 15 cents per bale or accrued interest, whichever is less
 Section 12 further set out the association's obligations in the event it sold its equity interest prior to redemption of the collateral:
 If the Association sells or permits its members to sell their interest in any cotton pledged to CCC hereunder, it shall redeem such cotton within 15 days from the date of such sale.
 Finally, Sec. 12 concludes by referring to the trust receipt method of effecting sale of the association's equity interest:
 CCC may, if it deems it desirable, release warehouse receipts to the Association against trust receipts acceptable to CCC.
 Section 10 of the Agreement required the association to furnish a bond guaranteeing that the association would fully discharge all its obligations under the Agreement. Accordingly, UFMA secured from St. Paul and Boston broadly worded performance bonds in the aggregate face amount of $265,000. These bonds were substantively identical and provided in pertinent part:
 WHEREAS, the principal has entered into a 1963 Cotton Cooperative Loan Agreement with CCC dated September 10, 1963 under which CCC has undertaken to make loans on cotton to the principal in accordance with the terms and conditions of that Agreement; and
 WHEREAS, the principal is required by the terms of that Agreement to discharge certain obligations in connection with such cotton:
 NOW THEREFORE, the condition of this obligation is such that if the principal shall fully and completely discharge all obligations to CCC required by the said 1963 Cotton Cooperative Loan Agreement, or any amendment thereto heretofore or hereafter made, then this obligation to be null and void; otherwise to be and remain in full force and effect.PROVIDED, HOWEVER, That this bond is executed upon the following express conditions:
 (1) This bond shall cover only these obligations of the principal arising under the said 1963 Cotton Cooperative Loan Agreement or any amendments thereto heretofore or hereafter made, which arise during [a specified period].
 (2) No extension of time or other waiver or amendment of the terms and conditions of the 1963 Cotton Cooperative Loan Agreement granted to the principal by CCC shall relieve the surety from its obligations hereunder, and the surety waives notice of any such extension, waiver, or amendment.
 In accordance with the 1963 Loan Agreement, UFMA tendered cotton to CCC for loans and CCC released warehouse receipts in trust to UFMA. The value of warehouse receipts released to UFMA in trust during the 1963 season was approximately $54 million. For a month or so after the parties executed the September 1963 Agreement, UFMA functioned smoothly. In December 1963, however, CCC learned through standard periodic investigations that UFMA was experiencing trouble redeeming cotton collateral sold by UFMA, and that some trust receipts had been outstanding for more than 15 days. CCC was advised that UFMA did not have sufficient funds both to redeem cotton and to cover producer drafts of its individual members. CCC then directed the First National Bank of Lubbock, which was acting as UFMA's servicing agent, to use available proceeds to cover producer drafts. To allow UFMA to rehabilitate itself, CCC officials waived the 15-day redemption requirement, and, at the same time, suspended UFMA's trust receipt privileges.
 While the December crisis raised the spectre of financial instability, CCC's ensuing investigations revealed that UFMA's problem was caused by administrative delays in processing warehouse receipts tendered to CCC by individual producers. In short, UFMA had been paying individual producers for their warehouse receipts more rapidly than it had been obtaining loan proceeds from CCC. At any rate, by December 30, 1963, UFMA had sufficient funds to redeem the cotton, and trust receipt privileges were resumed.
 The second crisis came the following April. From March 27 through April 4, 1964, CCC released to UFMA, in trust, warehouse receipts evidencing 3,421 bales of cotton which had a loan value of $500,103.08. Upon receiving the warehouse receipts UFMA sold its interest in this cotton, but it did not redeem the collateral within 15 days of sale. Hindsight now shows that UFMA had been kiting its obligations-i. e. using proceeds of new loans to meet old obligations. The kite's string ran out, in this case, with trust receipts covering the 3,421 bales in issue. By April 7 it was obvious that UFMA had no funds with which to redeem the 3,421 bales. CCC duly notified UFMA and sureties that UFMA was in default of its obligations and demanded payment. UFMA failed to redeem the collateral, and sureties have refused to indemnify CCC for its loss.
 
 
 [1]
 Jurisdiction and Applicable Law
 Federal jurisdiction over the sureties' suit for declaratory relief and CCC's counterclaim was properly based on 15 U.S.C. Sec. 714b, which provides that "[t]he district courts of the United States . . . shall have exclusive original jurisdiction, without regard to the amount in controversy, of all suits brought by or against the [Commodity Credit] Corporation."
 Construction of the suretyship contract between CCC on the one hand and St. Paul and Boston on the other must be determined by federal law. E. g., U. S. v. McCabe Co., 261 F.2d 539 (8th Cir. 1958); Colden v. Asmus, 322 F.Supp. 1163, 1164 (S.D.Cal.1971); U.S. v. Tyler, 220 F.Supp. 386 (N.D.Iowa 1963); see Priebe & Sons v. U. S., 332 U.S. 407, 411, 68 S.Ct. 123, 92 L.Ed. 32, 38 (1947); U. S. v. Standard Rice Co., 323 U.S. 106, 111, 65 S.Ct. 145, 89 L.Ed. 104, 107 (1944); Fansteel Metallurgical Corp. v. U. S., 145 Ct.Cl. 496, 172 F.Supp. 268, 270 (1959); Wright, Law of Federal Courts Sec. 60, at 215 (1963). For guides to the "law of independent federal judicial decision," U. S. v. Standard Oil Co., 332 U.S. 301, 308, 67 S.Ct. 1604, 1608, 91 L.Ed. 2067, 2072 (1947), we look principally to federal decisions in nondiversity cases, but without blinders to persuasive analogies from state law. See id. See also Moragne v. States Marine Lines, 398 U.S. 375, 408, 90 S.Ct. 1772, 26 L.Ed.2d 339, 361 (1970).
 
 
 [2]
 1963 Loan Agreement Obligations
 The threshold issue in the District Court was whether UFMA had breached the trust receipt agreement or the 1963 Loan Agreement. The court ruled that UFMA had breached only the trust receipt agreement. Since it also ruled that sureties bonded only Loan Agreement obligations, the court granted relief in favor of sureties.
 Through the complicated factual setting of this case emerges a remarkably direct solution. Indisputably the sureties bonded obligations arising under the 1963 Cotton Cooperative Loan Agreement. Section 12 of that agreement provides that "[i]f the Association sells . . . its . . . interest in any cotton pledged to CCC hereunder, it shall redeem such cotton within 15 days from the date of such sale." UFMA sold its interest in 3,421 bales that had been released in trust to UFMA, as authorized by the Loan Agreement: "CCC may, if it deems it desirable, release warehouse receipts to the Association against trust receipts acceptable to CCC." UFMA did not redeem the collateral within 15 days of sale. By its failure to redeem UFMA breached the 1963 Loan Agreement. The 3,421 bales in issue had a loan value of about $0.5 million. The sureties are therefore prima facie liable to indemnify CCC up to the $265,000 face amount of the bonds for CCC's losses caused by UFMA's breach of the Loan Agreement.
 To this analysis sureties pose two objections. First, they suggest that CCC did not ground its lawsuit on the theory that UFMA's sale and nonredemption of cotton was a breach of the 1963 Agreement. We find that suggestion to be without merit. By paragraph 9 of its amended counterclaim, CCC alleged that UFMA "sold said 3,421 bales of cotton . . . did not return said 3,421 warehouse receipts to the Bank or to CCC, did not redeem said 3,421 bales of cotton, and did not hold the proceeds of the sale of said 3,421 bales of cotton in trust for CCC, all in breach of the terms of the loan agreement and the trust receipts." (emphasis added) Therefore, the issue of breach of the Loan Agreement was properly before the District Court.[4]
 Sureties' second argument is that CCC waived the 15-day redemption requirement, and in support thereof refer to testimony by CCC officials that CCC waived the 15-day requirement. In context, the testimony to which sureties refer relates to the crisis in December when UFMA fell behind in its obligations because of administrative difficulties. At that time CCC did waive the 15-day requirement to allow UFMA to rehabilitate itself. The testimony does not indicate, however, that CCC waived the redemption requirement in April, when the losses made the basis of this lawsuit occurred. To the contrary, nonwaiver is unequivocally indicated by CCC's timely insistence that UFMA redeem collateral, and its demand of April 13, 1964, that sureties indemnify CCC for losses caused by UFMA's default. Sureties have failed to show a waiver of the 15-day redemption requirement in April.[5]
 
 
 [3]
 "Affirmative" Defenses
 At trial and on appeal sureties have relied on several so-called "affirmative" defenses which were independent of its lead argument that UFMA breached only trust receipt obligations. Appellees have stated their affirmative defenses to be the following: (1) CCC's surrender and release of the pledged collateral deprived sureties of their right of subrogation and released sureties from their obligations under the bonds; (2) CCC's loss occurred prior to the time when Boston's bond and St. Paul's second bond became effective; (3) CCC failed to inform the bonding companies of the extraordinary risk of the defaults by UFMA before the last two bonds were written; (4) CCC failed to inform the bonding companies of defaults by UFMA after the bonds were written; (5) sureties are entitled to certain offsets in the event they are liable on their bonds. The trial court did not consider these defenses, since it found the sureties' first defense a good one. We decline to address these issues for the first time on appeal, without findings of fact or conclusions of law for reference, and we remand the case to the trial court for consideration of sureties' affirmative defenses.
 
 
 [4]
 Conclusion
 As we read the opinion below, the District Court ruled in favor of sureties for three reasons: (1) UFMA breached only trust receipt obligations; (2) sureties bonded only Loan Agreement obligations; and (3) the Loan Agreement did not incorporate trust receipt obligations by reference. Because we have held that UFMA breached Loan Agreement obligations, which sureties indisputably bonded, we have not reached the issues concerning the precise scope of sureties' bonds or the possibility of incorporation by reference. Our failure to reach these issues should not be construed as approval of the District Court's views on them. If on remand either the scope of sureties' bonds or the possibility of incorporation by reference is relevant to one or more of the affirmative defenses, the District Court should feel free to re-examine its views in light of the principle that a surety's obligation should be construed by reading together all instruments, statutes, and regulations underlying the transaction. E. g., St. Paul Fire & Marine Ins. Co. v. Tennefos Constr. Co., 396 F.2d 623 (8th Cir. 1968); Triangle Elec. Supply Co. v. Mojave Elec. Co., 234 F.Supp. 293 (W.D.Mo.1964); see U. S. ex rel. Sherman v. Carter, 353 U.S. 210, 77 S.Ct. 793, 1 L.Ed.2d 776 (1957); U. S. ex rel. Strona v. Bussey, 51 F.Supp. 996 (D.C.Cal.1943).[6]
 The cause is reversed and remanded for proceedings not inconsistent with this opinion.
 
 
 [1]
 By paragraph 9 of its amended counterclaim, CCC alleged:
 "9. From March 27, 1964, through April 4, 1964, United obtained from the Bank 3,421 warehouse receipts representing 3,421 bales of cotton pledged by it under the loan agreement by issuing ten trust receipts, Nos. 409 through 418, inclusive, pursuant to the loan agreement. The loan indebtedness with respect to said 3,421 bales of cotton was Five Hundred Thousand One Hundred Three and 8/100 Dollars ($500,103.08), plus interest and charges. United sold said 3,421 bales of cotton for the sum of Four Hundred Ninety-Nine Thousand Four Hundred Thirty-Five and 52/100 Dollars ($499,435.52). United did not return said 3,421 warehouse receipts to the Bank or to CCC, did not redeem said 3,421 bales of cotton, and did not hold the proceeds of the sale of said 3,421 bales of cotton in trust for CCC, all in breach of the terms of the loan agreement and the trust receipts. By reason of such breach by United, plaintiff has been damaged to the extent of Five Hundred Thousand One Hundred Three and 8/100 Dollars ($500,103.08), plus interest and charges, the amount required to redeem said 3,421 bales of cotton, and [United] is indebted to plaintiff in this amount."
 
 
 [2]
 St. Paul and Boston filed separate answers, but each was identical in material respects to the other. The parties have not distinguished between the answers nor do we
 
 
 [3]
 Aside from the government's explanations in its brief, the outline of the cotton price support scheme, as pertinent to this appeal, is derived from four sources: (1) Those portions of the Agricultural Act of 1949 codified at 7 U.S.C.A. Secs. 1421-68 (1964), as amended, (Supp.1972); (2) CCC's Cotton Loan Program Regulations, 7 C.F.R. Secs. 1427.1351-1427.1376 (1963); (3) CCC's Commercial Bank Handbook for Cotton Loan Servicing Agents; and (4) the opinion of the court below
 
 
 [4]
 Sureties suggest, in a footnote to their supplemental brief filed after oral argument, that CCC introduced no evidence of sale of cotton. The suggestion is unpersuasive. St. Paul in effect admitted in its answer that UFMA sold cotton:
 "Cross-Defendant admits . . . that 3,421 bales of cotton were withdrawn on trust receipt by United, that United did not redeem said 3,421 bales of cotton and did not hold the proceeds of the sale of said 3,421 bales of cotton in trust for CCC . . . ."
 (emphasis added) Moreover, the record contains ample evidence of sale. For example, an "Analysis of Trust Activity" is included in the record, as well as an "Analysis of Deposits of Proceeds Received from Sale of Cotton Withdrawn on Trust Receipt." These accounting schedules not only show dates of sale, but trace application of the sale proceeds.
 
 
 [5]
 Perhaps sureties are obliquely suggesting that by prior acceptance of late performance in December, CCC is estopped to assert late performance in April. See 3A Corbin, Law of Contracts Sec. 722, at 380 (1960). An estoppel defense would not succeed, however, for several reasons. First, sureties, as nonparties to the Loan Agreement, have not established their right to assert an equitable defense inuring to the benefit of a contractual party. Cf. The Phillips & Colby Constr. Co. v. Seymour, 91 U.S. 646, 23 L.Ed. 341 (1876). Secondly, estoppel defenses require a showing of prejudice, and sureties have abandoned their right to claim prejudice from time extensions by their agreement in the bond that "[n]o extension of time or other waiver or amendment of the terms and conditions of the 1963 Cotton Cooperative Loan Agreement granted to the principal by CCC shall relieve the surety from its obligations hereunder, and the surety waives notice of any such extension, waiver, or amendment." See 10 Williston, Law of Contracts Sec. 1223, at 729 (3d ed. 1967) ("If the surety assents to the extension of time in his original contract or before the extension is given, he will not be discharged on the ground either of the terms of his contract or of waiver . . . ."). Finally, even if the time for performance was in some way extended by CCC's prior acceptance of late performance, it has been exceeded in this case. Not only did UFMA not redeem within 15 days; it had not redeemed by the filing of this appeal
 
 
 [6]
 See also the rule that consent to surrender of collateral may be implied from the custom of the business. 10 Williston, Law of Contracts Sec. 1232 (3d ed. 1967)