UNITED STATES of America for the use of B & M ROOFING OF COLORADO, INC., Plaintiff,

v.

AKM ASSOCIATES, INC., a Pennsylvania corporation and Amwest Surety Insurance Company, a California corporation, Defendants,

and

AMWEST SURETY INSURANCE COMPANY, a California corporation, Counterclaimant,

v.

B & M ROOFING OF COLORADO, INC., a Colorado corporation, Plaintiff.

and

Arapahoe Roofing & Sheet Metal, Inc., a Colorado corporation; Brookhart's Inc., a Colorado corporation; Fastening Systems Inc., a Colorado corporation; Mile High Roofing Materials, Inc., a Colorado corporation; High Country Manufacturing Consulting, Ltd., a Colorado corporation, d/b/a Precision Machine Works & Welding; Resco Inc., a Colorado corporation, d/b/a Allied Building Products Corp.; Waste Management of Colorado Inc., d/b/a Waste Management of Colorado Springs, a Colorado corporation; Bill's Tool Rental, Inc., d/b/a Springs Contractor Supply, a Colorado corporation; The Scotsman Group, Inc., d/b/a William Scotsman, Interpleaded Defendants.

Civil Action No. 96–WY–100–CB.

United States District Court, D. Colorado.

March 17, 1997.

Jonathan L. Miller, Lawrence C. Rider, Boulder, CO, for Plaintiffs.

David K. Kerr, Andrew J. Friedrich, Denver, CO, for Defendants/Counterclaimants.

Jean C. Arnold, Littleton, CO, for Interpleader Defendants.

## ORDER ON MOTIONS FOR SUMMARY JUDGMENT

BRIMMER, District Judge.

Both interpleaded defendant Mile High Roofing Materials Inc. ("Mile High") and defendant Amwest Surety Insurance Company ("Amwest") filed motions for summary judgment asking the Court to determine the limits of Amwest's liability. Use plaintiff B & M Roofing of Colorado ("B & M") opposes Amwest's motion. Amwest opposes Mile High's motion.

### *Background*

Amwest contracted with Defendant AKM Associates, Inc. ("AKM") to provide bid, pay-

ment, and performance bonds for United States Government indefinite delivery, indefinite quantity ("IDIQ") Contract No. F0561194D0003, (the "Contract") for roofing repairs at the United States Air Force Academy (the "Academy").

The Contract was for a one year period from March 1994, subject to options for additional years and guaranteed work between a minimum of $200,000 and a maximum of $9,000,000. A varying contract price is inherent in IDIQ contracts; as delivery orders are placed, the value of the contract rises.

At the outset, AKM, as principal, and Amwest, as surety, provided a Miller Act performance bond with a penal sum of $200,000 and a Miller Act payment bond with a penal sum of $100,000. Amwest billed and received $5,000 for these bonds.

During the first year of the Contract several delivery orders were placed and the value of the Contract exceeded $1,000,000 (the exact value is disputed). On March 2, 1995, the Academy exercised the first year option. The Academy sent a Consent of Surety form along with notice of the exercise of the first year option to Amwest. Additional delivery orders were placed during the first option year, but the Consent of Surety form was never returned.

In early June 1995, Amwest requested and received a status report from the Academy. Pursuant to this status report, Amwest billed AKM additional premiums of $17,675. In a letter to AKM, Amwest agent Doug Taylor stated that the additional premiums were "associated with the contract price of $1,081,-237.00." Use Plf.'s Resp. Br. Ex. 9.

During this same time, the Academy began experiencing problems with AKM. AKM had fallen behind schedule and a cure notice was issued. As a result, the Academy granted an extension to AKM, giving it until October 31, 1995, to complete certain delivery orders. AKM also fell behind in its payments to subcontractors and materialmen. Eventually, these problems resulted in the Academy terminating the Contract with AKM. Conse-

quently, the unpaid subcontractors and materialmen filed this action.

### *Standard of Review*

The specific standards for summary judgment are well recognized, and need only be briefly restated. Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that the moving party is entitled to summary judgment as a matter of law." Fed.R.Civ.P. 56(c); see also *Martin v. Nannie and the Newborns, Inc.*, 3 F.3d 1410, 1414 (10th Cir. 1993).

### *Analysis*

■ Amwest contends its liability is limited to $100,000, the stated penal sum of the Miller Act payment bond. B & M and Mile High argue that AKM and Amwest are liable for all unpaid materials and labor supplied.[1] B & M and Mile High advance two arguments: Amwest is liable under the terms of the Contract, and Amwest is liable under the equitable doctrine of quantum meruit. The Court will address each of these arguments in turn.

### I. The Miller Act

It is universally accepted that the Miller Act protects subcontractors and suppliers. *United States ex rel. C.J.C., Inc., v. W. States Mechanical Contractors*, 834 F.2d 1533, 1537 (10th Cir.1987). The Miller Act provides an alternative remedy to the mechanics' lien ordinarily available on private construction projects. Because a lien cannot attach to federal property, suppliers of materials or labor are protected by a payment bond. *J.W. Bateson Co. Inc., v. United States ex rel Bd. of Trustees of the Nat'l Automatic Sprinkler Indus. Pension Fund*, 434 U.S. 586, 589, 98 S.Ct. 873, 875, 55 L.Ed.2d 50 (1978).

---

1. For all practical purposes, this action is limited to Amwest, as AKM apparently is unable to satis-

fy any judgment.

### A. The Contract and the Bonds

■ In analyzing the extent of Amwest's liability, the Court must divine the meaning of the Contract and the payment bond.[2] *In re Sinking of M/V Ukola*, 806 F.2d 1, 4–5 (1st Cir.1986). Amwest's liability must be determined by reading the Contract, payment bond, Miller Act, and any applicable regulations. *St. Paul Fire and Marine Ins. Co. v. Commodity Credit Corp.*, 474 F.2d 192, 199–200 (5th Cir.1973). Interpreting the language of the Contract and payment bond is important because the parties disagree both as to payment bond's penal sum and the duration of its coverage.

### 1. The Penal Sum

From the outset, both AKM and Amwest were put on notice that the Contract was "an Indefinite Delivery, Indefinite Quantity (IDIQ) contract...." Contract at 3. Under the section entitled "BONDS," the Contract states that AKM and Amwest "should consider the cumulative effects of Delivery Orders (DO) placed against this contract ... in determining total bonding liability and costs." Contract at 4.[3]

After notifying AKM and Amwest that the Contract is an IDIQ contract, the Contract clearly obligates AKM and Amwest to determine their own total bonding liability. The Contract also unambiguously instructs AKM and Amwest that total bonding liability (for both the performance and payment bonds) is calculated by adding the total value of the delivery orders that have been placed.

This provision that automatically increases the bonding liability when additional materials or labor is supplied is uniquely suited to IDIQ contracts for three reasons. First, requiring automatic increases in bonding protection each time the Contract price increases is efficient. It obviates the need for the Academy to require additional bonding protection each time supplies are provided. Second, this provision forces the parties that are best able to monitor increases in the Contract's value to ensure that the bonds protect materialmen by placing the ultimate responsibility on the prime contractor and surety. Asking the Academy to protect suppliers would have been illogical, as the federal government cannot be held liable for failing to require adequate bonding protection. See *Arvanis v. Noslo Engineering Consultants, Inc.*, 739 F.2d 1287 (7th Cir.1984). Third, the provision protects the suppliers at all times. No gaps in protection can occur because the surety is liable for all materials and labor immediately upon delivery. This approach allows the Miller Act to provide an adequate alternative to the traditional mechanics' lien in the context of an IDIQ contract.

This interpretation is in harmony with both the universally accepted purpose of the Miller Act (to protect suppliers of labor and materials) and the applicable Federal Acquisition Regulations. When the minimum quantity of an IDIQ contract is exceeded, the government may require additional protection. 48 C.F.R. Ch. 1, F.A.R. 28.102–2(c)(2) (1996). The only requirement placed on acquiring additional bonding protection is that the penal amount of the additional payment bond be in accordance with 48 C.F.R. Ch. 1, F.A.R. 28.102–2(b)(1) (1996) (the total price of the Contract dictates the penal sum of a payment bond). By monitoring the value of the Contract, Amwest could have readily determined the penal sum of the payment bond, and consequently its liability, at any time.

Based on the foregoing, the Court finds that Amwest may be found liable for amounts in excess of the penal sum that appears on the face of the payment bond. Of

---

**2.** Both B & M and Mile High urge the Court to adopt a minority position allowing them to seek relief from the performance and payment bonds. The Court declines to do so. The majority position restricting suits by suppliers to the payment bond reflects the better reasoned approach. *See United States ex rel. Warren v. Kimrey*, 489 F.2d 339, 343–44 (8th Cir.1974); *Transamerica Premier Ins. Co. v. Ober*, 894 F.Supp. 471, 475–80 (D.Me.1995); *see also United States Fidelity & Guaranty Co. v. American State Bank*, 372 F.2d

449, 450 (10th Cir.1967) (finding that Miller Act payment and performance bonds represent separate obligations for the benefit of separate obligees).

**3.** This sentence is addressing the "bidder." The Court finds that the term "bidder" refers both to AKM and Amwest because the bidding process is a joint effort between principal and surety.

course, liability is subject to suppliers proving their claims at trial and the payment bond liability may not exceed forty percent (40%) of the total Contract price (assuming the Contract price is found to be between $1 million and $5 million). 48 C.F.R. Ch. 1, F.A.R. 28.102–2(b)(1)(ii) (1996).

### 2. The Duration

■ Amwest contends that it is not liable for any materials or labor supplied past the end of the first year of the Contract because it never returned the Consent of Surety form. Mile High argues that Amwest's failure to return the form is not dispositive. Mile High claims that Amwest continued to act as surety during the second year as evidenced by Amwest requesting and receiving progress reports and by Amwest billing and receiving additional premiums.

In *United States ex rel. Modern Elec. Inc. v. Ideal Elec. Sec. Co.,* 868 F.Supp. 10 (D.D.C.1994), *rev'd on other grounds,* 81 F.3d 240 (D.C.Cir.1996), a claim almost identical to Mile High's was adjudicated. The *Ideal* court found that both the underlying contract and the bonds clearly indicated that the bonds' coverage was limited to the initial year of the contract. Although the language employed here is different, the intent appears to be the same.

When the Academy exercised its option, AKM had 30 days to provide proof of its ability to obtain new bonds and an additional 15 days to obtain the actual bonds. Contract at 4. It is undisputed that AKM failed to obtain new bonds.

■ The crucial difference between this action and the one decided by the *Ideal* court is that Amwest's actions are not consistent with limiting liability to the initial year of the Contract.[4] The surety in *Ideal* did not collect any additional premiums after the initial year. *Id.* at 14. Amwest, on the other hand, collected additional premiums during the first option year. *See* Mile High Motion for Summary Judgment Exs. 11 and 16. Whether these premiums were payment for protection already provided during the initial year is disputed. Amwest also requested and received status reports from the Academy during the first option year. *See* Carol Mohr Aff. Ex. C. The purpose of obtaining these status reports is also disputed.

The Court cannot hold Amwest liable for coverage it did not intend to provide. *Ideal,* 868 F.Supp. at 14. However, Amwest's actions appear inconsistent with the intent to limit its exposure to the Contract's initial year. As a result, the question of whether Amwest can be held liable for delivery orders placed during the first option year of the Contract presents an issue of disputed material fact that must be resolved by the jury.

### B. Quantum Meruit

■ Even if Amwest's liability is limited to the first year of the contract, Mile High is not without a remedy. The Tenth Circuit recognizes a right of action for quantum meruit in Miller Act contracts. *See United States ex rel. Sunworks Div. of Sun Collector Corp. v. Ins. Co. of N. America,* 695 F.2d 455, 458 (10th Cir.1982). Quantum meruit allows Mile High to recover the value of its services and supplies irrespective of whether it can recover under the Contract. *See United States ex rel. C.J.C., Inc. v. W. States Mechanical Contractors, Inc.,* 834 F.2d 1533, 1539 (10th Cir.1987). The reasonable value of Mile High's performance is the amount for which such services could have been purchased from one in Mile High's position at the time and place the services were rendered. *Id.* This remedy is available against the surety, as well as the prime contractor. *Id.* at 1550.

### *Conclusion*

Based on the foregoing, the Court **ORDERS** that Amwest and Mile High's motions

---

4. Contracts to which the federal government is a party pursuant to federal law are interpreted according to federal common law. *United States v. Triple A Mach. Shop, Inc.,* 857 F.2d 579, 585 (9th Cir.1988). Federal common law embodies the general principles of contract law. *See United States ex rel. C.J.C., Inc. v. W. States Mechani-* *cal Contractors, Inc.,* 834 F.2d 1533, 1539 n. 2 (10th Cir.1987). The general trend in contract interpretation allows consideration of extrinsic evidence of the surrounding circumstances. *See* 3 Arthur L. Corbin, Corbin on Contracts § 542 (1960).

for summary judgment are **DENIED.**[5]

The Court finds that the Contract placed Amwest under an affirmative duty to provide payment and performance bond protection commensurate with the total amount of labor and materials supplied at any given time during the initial year of the Contract up to forty percent (40%) of the Contract price (assuming the contract price was between $1 million and $5 million). The Court also finds that the extent of Amwest's liability for labor and materials supplied during the first option year of the Contract presents issues of material fact that must be resolved by the jury.

---

5. The Court reserves judgment at this time as to whether Mile High may collect attorneys' fees and other related costs. Should Mile High succeed at trial, the Court will allow the parties to file post-trial motions on these issues.