**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**DEC 3 2004**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA for
the use and benefit of CORTEZ III
SERVICE CORPORATION, a New
Mexico corporation,

      Plaintiff-Appellant-
      Cross-Appellee,

v.

PMR CONSTRUCTION SERVICES,
INC., a New Mexico corporation,

      Defendant.

and

CAPITOL INDEMNITY
CORPORATION, a Wisconsin
corporation,

      Defendant-Appellee-
      Cross-Appellant.

-------------------------------

THE SURETY ASSOCIATION OF
AMERICA,

      Amicus Curiae.

Nos. 03-2045, 03-2052
(District of New Mexico)
(D.C. No. CIV-00-133 JC/KBM)

**ORDER AND JUDGMENT***

Before **MURPHY**, **ANDERSON**, and **HARTZ**, Circuit Judges.

## I. INTRODUCTION

Cortez III Service Corporation brought this suit against PMR Construction Services, Inc. as principal and Capitol Indemnity Corporation as surety to recover on a bond issued pursuant to the Miller Act. 40 U.S.C. §§ 3131-3134.[1] PMR subsequently filed for bankruptcy and proceedings against it were stayed. The district court entered judgment for Capitol after a one-day bench trial, accepting Capitol's defense that Cortez's claims were not within the scope of the bond's coverage. Cortez appeals this judgment. Capitol cross-appeals on the ground that the court erroneously rejected its alternative defense that Cortez was a joint venturer with PMR and therefore ineligible for bonding protection under the Miller Act. This court has jurisdiction pursuant to 28 U.S.C. § 1291. Because the

---

*This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

[1]At the time the bond and associated contract were executed, the Miller Act was codified at 40 U.S.C. §§ 270a-270e. This order and judgment will cite to the statute's current codification.

language of bond and its associated contract unambiguously supports Cortez's position, this court **reverses** and **remands** the judgment of the district court.

## II.   BACKGROUND

In 1997, PMR entered a contract with the federal Defense Special Weapons Agency to provide labor and materials on a construction project at the White Sands Missile Range in New Mexico.  The contract was an indefinite-quantity contract,[2] meaning the government was required to purchase an agreed minimum amount of materials and services, but was authorized to make additional purchases beyond the minimum amount.  48 C.F.R. § 16.504(a).  Indefinite-quantity contracts are designed to provide the government with purchasing flexibility for requirements it cannot anticipate with specificity.  *Travel Ctr. v. Barram*, 236 F.3d 1316, 1318-19 (Fed. Cir. 2001).  In addition to the minimum price, the applicable regulations at the time the contract was executed also required indefinite-quantity contracts to specify the period of the contract, "including the number of options and the period for which the contract may be extended under each option."  48 C.F.R. § 16.504(a)(4)(i) (1997).

Accordingly, the contract provided for a minimum price of $713,000 during a one-year base period, with the government having the option to extend the

---

[2] Indefinite-quantity contracts are also known as indefinite-delivery, indefinite-quantity ("IDIQ") contracts.

contract by up to four additional one-year periods. The contract specified prices for work completed during the base year and for recurring tasks during the base period and each option year. It also gave the government the power to unilaterally increase or decrease its orders during the base and option years.

PMR hired Cortez as a subcontractor on the project. Under the Miller Act, general contractors on federal construction projects are required to post a bond to protect subcontractors in case of payment default. 40 U.S.C. § 3131(b)(2). Miller Act bonds serve as substitutes for mechanics' liens ordinarily available on private construction projects, because mechanics' liens cannot attach to federal property. *F. D. Rich Co. v. United States ex rel. Indus. Lumber Co.*, 417 U.S. 116, 122 (1974). In the case of indefinite-quantity contracts, the applicable regulations at the time the contract was executed required the bond to be valued at half the minimum price of the contract. 48 C.F.R. § 28.102-2(b)(1)(i), (c)(2) (1997). PMR's contract with the government therefore called for a bond of $356,500, representing half the $713,000 minimum contract price. Capitol issued the bond, which specified it was to become void when PMR made payment to all subcontractors for "work provided for in the contract . . . and any authorized modifications of the contract that subsequently are made."

The contract's one-year base period began in September 1997 and ended in 1998. Before the expiration of the base period, the government had raised the

actual price of the contract to about $3.8 million and invoked its first one-year option. By that time, the government had already paid PMR more than the $713,000 minimum price of the contract, and PMR had paid Cortez in full for this portion of the work. Cortez alleges that PMR breached the subcontract in August 1999, near the end of the first one-year option period, by failing to pay more than $1 million it owed to Cortez.

Cortez filed suit against PMR for the amount due under the subcontract, and against both PMR and Capitol for the $356,000 face value of the bond. Capitol argued the bond was inapplicable because it only covered claims for work that both (1) was performed during the contract's base period, and (2) did not exceed the guaranteed minimum amount of the contract. It also asserted that Cortez was a joint venturer with PMR rather than a subcontractor, and therefore had no standing to collect on the bond. Although the value of the contract had increased considerably beyond the contract's guaranteed minimum value, the parties agreed Cortez could not recover more than half of the contractual minimum because the face value of the bond was based on that amount.[3] Litigation against PMR was stayed because the company had filed for bankruptcy.

---

[3] The court in *United States ex rel. B & M Roofing of Colorado, Inc. v. AKM Associates, Inc.*, concluded that a provision in the contract between the parties subjected the surety to liability exceeding the face value of the bond. 961 F. Supp. 1441, 1444 (D. Colo. 1997). Cortez does not argue that the contract in this case compels a similar result.

During a one-day bench trial, both parties introduced exhibits and testimony supporting their interpretations of the bond. Before Capitol could call witnesses in support of its joint venture defense, the court ordered briefing on the issue of whether the bond covered Cortez's claim. The parties filed their briefs, and the district court then entered an order dismissing the suit. The court concluded that "nothing in the payment bond or the contract stat[es] that the bond continues beyond the basic year or is intended for amounts in excess of $713,000." The court also rejected Capitol's joint venture defense, concluding that "[Capitol] has not produced any evidence" of such a joint venture. The order was later amended to dismiss only Cortez's claims against Capitol.

Cortez appeals the district court's decision that the bond does not cover its claims. In its cross-appeal, Capitol argues that if the case is remanded to the district court it should have an opportunity to present evidence that Cortez and PMR were joint venturers.

## III. DISCUSSION

### A. Cortez's Appeal

The proper standard of review of the district court's interpretation of the bond depends on whether the bond is unambiguous. When a district court relies on extrinsic evidence to interpret an ambiguous contract, this court reviews for clear error. *Cavic v. Pioneer Astro Indus., Inc.*, 825 F.2d 1421, 1424 (10th Cir.

1987). A district court's interpretation of an unambiguous contract, however, is a question of law that is reviewed *de novo*. *Valley Improvement Ass'n v. United States Fid. & Guar. Corp.*, 129 F.3d 1108, 1115 (10th Cir. 1997).

The district court in this case admitted extrinsic evidence on the meaning of the bond, which would ordinarily be proper only if it had held the bond to be ambiguous. *Homestake-Sapin Partners v. United States*, 375 F.2d 507, 511 (10th Cir. 1967). The court did not, however, specifically rely on the extrinsic evidence in support of its judgment. *See Cavic*, 825 F.2d at 1424 (reviewing for clear error a district court's interpretation of a contract that specifically relied on extrinsic evidence). Instead, it concluded only that "there is nothing in the payment bond or the contract stating that the bond continues beyond the basic year or is intended for amounts in excess of $713,000." The court cited *United States ex rel. Modern Electric, Inc. v. Ideal Electronic Security Co.*, which held a similar bond to be unambiguous as a matter of law. 868 F. Supp. 10, 13 (D.D.C. 1994). Although the court did not explicitly decide the issue of whether the bond was ambiguous, its judgment therefore appears to be based on its tacit conclusion that the bond unambiguously supports Capitol's interpretation.

The question of whether a contract is ambiguous is a question of law that is reviewed *de novo*. *Republic Res. Corp. v. ISI Petroleum W. Caddo Drilling Program 1981*, 836 F.2d 462, 465-66 (10th Cir. 1987). The *de novo* standard

applies to the issue of ambiguity even when the district court admitted extrinsic evidence on the meaning of the contract. *Paragon Res., Inc. v. Nat'l Fuel Gas Distribution Corp.*, 695 F.2d 991, 995 (5th Cir. 1983). Under federal law, a contract provision is ambiguous when it is "reasonably susceptible to more than one meaning, or where there is uncertainty as to the meaning of a term." *Pirkheim v. First Unum Life Ins.*, 229 F.3d 1008, 1010 (10th Cir. 2000) (quotation omitted); *see also Kennewick Irrigation Dist. v. United States*, 880 F.2d 1018, 1032 (9th Cir. 1989).[4] In addition, the Miller Act "is entitled to a liberal construction and application in order properly to effectuate the Congressional intent to protect those whose labor and materials go into public projects." *United States ex rel. Sherman v. Carter*, 353 U.S. 210, 216 (1957) (quotation omitted).

This court agrees with the district court that the bond is reasonably susceptible to only one interpretation. The bond's plain language, however, does not support the district court's construction. The court accepted Capitol's argument that the bond was limited to both (1) the one-year base period, and (2)

---

[4] Because federal law controls the construction of government contracts, "the obligation of a surety on a bond furnished under the Miller Act must be determined by federal law." *Am. Auto Ins. Co. v. United States ex rel. Luce*, 269 F.2d 406, 408 (1st Cir. 1959); *see United States ex rel. Bldg. Rentals Corp. v. W. Cas. & Sur. Co.*, 498 F.2d 335, 338 n.4 (9th Cir. 1974); *Cont'l Cas. Co. v. Schaefer*, 173 F.2d 5, 8 (9th Cir. 1949); *see also F. D. Rich Co. v. United States ex rel. Indus. Lumber Co.*, 417 U.S. 116, 127 (1974) ("The Miller Act provides a federal cause of action, and the scope of the remedy as well as the substance of the rights created thereby is a matter of federal not state law.").

the $713,000 minimum value of the contract. The language of the bond supports neither of these limitations. On its face, the bond contains no termination date or maximum contract value. On the contrary, it explicitly covers PMR's contract with the government and "any authorized modifications of the contract that subsequently are made." The meaning of "authorize" includes "to endow with authority or effective legal power, warrant, or right." *Webster's Third New International Dictionary* 146 (1993). The "authorized modifications" language therefore unambiguously covers both the government's authority to extend the length of the contract by up to four years and its authority to unilaterally increase its orders above the guaranteed minimum during the contract's base year.

In addition to the terms of the bond itself, courts must examine the terms of the accompanying contract to determine the scope of a surety's obligation under the Miller Act. *St. Paul Fire & Marine Ins. Co. v. Commodity Credit Corp.*, 474 F.2d 192, 199-200 (5th Cir. 1973). Capitol argues that the government had not exceeded the minimum contract price or invoked any of its options at the time the bond was issued, and that therefore these extra amounts should be excluded from the bond's coverage. Even though the government had not exercised its rights under the contract at the time the bond was executed, however, the contract did authorize it to do so at a future date. By their nature, indefinite-quantity contracts give the government the legal power to unilaterally increase the contract's

-9-

minimum quantity. *See* 48 C.F.R. § 16.504(a)(1).[5]  In addition, section F-2 of the contract explicitly defined the term of the contract to include both the base year and the four one-year option periods. *See also* 48 C.F.R. § 16.504(a)(4)(i) (1997) (requiring indefinite-quantity contracts to specify the period of the contract, "including the number of options and the period for which the contract may be extended under each option").

The district court erred in relying on *Modern Electric* for the proposition that the phrase "authorized modifications of the contract that subsequently are made" in the bond unambiguously excludes option periods later invoked by the government.  868 F. Supp. at 13.  The *Modern Electric* court held that this language necessarily "covers only modifications that were authorized at the time the Bond was executed." *Id.*  It concluded that options periods not exercised at the time of execution were not yet authorized and were therefore excluded from the bond's coverage. *Id.*

The contract incorporated by reference into the bond in *Modern Electric*, however, specifically stated that bonding would be "separate for the base year and each option year." *Id.* at 14.  The *Modern Electric* court also relied on further language in the contract providing that if the government exercised its option to

_____

[5] Although the contract includes an "estimated maximum" value of $1,365,028.50 for the base year, Capitol does not argue that this value in any way limits its liability under the bond.

extend the contract, "the contractor shall be required to provide the appropriate [bonds] *at that time*." *Id.* Although Capitol argues the court's holding was independently supported by the plain meaning of the "authorized modifications" language in the bond, the *Modern Electric* court itself noted that "the terms of the Contract and the Bond are both pivotal to the question before the Court." *Id.* at 13. To the extent the *Modern Electric* court did read the "authorized modifications" language to include only modifications that had actually been made at the time of bond formation, this court disagrees. The phrase "authorized modifications that subsequently are made" unambiguously includes modifications that one party is empowered to make at contract formation but that are not exercised until a later date.

The decision in *Modern Electric* was based partly on the logic that the opposite interpretation would mean the surety "would be binding itself to cover material changes in the Contract that could greatly increase its risk, without increasing either the premium or the penal sum." *Id.* at 13. There was some evidence in this case, however, that Capitol attempted to collect additional premiums as the amount of the contract increased. Although this court expresses no view on the weight of this evidence or its relevancy, at least one district court in this circuit has considered the collection of additional premiums to be probative of the parties' intent to include option years within a bond's coverage.

*United States ex rel. B & M Roofing of Colo., Inc. v. AKM Assocs., Inc.*, 961 F. Supp. 1441, 1445 (D. Colo. 1997). In any case, consideration of the intended level of risk undertaken by Capitol does not change the unambiguous language on the face of the bond. *See Homestake-Sapin Partners*, 375 F.2d at 511 (holding that consideration of extrinsic evidence of the parties' intent is proper only when a contract is ambiguous in the first place).

Capitol asserted at oral argument that section I-87(b)(2) of the contract establishes that the bond was only intended to cover the first $713,000 of work. That section provides that the value of the bond must equal half the minimum contract price, and that the government has the option of demanding additional bonding if the contract price increases. That the $356,000 value of the bond was determined by reference to half the minimum contract price, however, does not mean the bond was not intended to cover a payment default after the minimum value of the contract had been surpassed. Nor does the provision giving the government the option of raising the value of the bond mean the bond was discharged when the government declined to invoke this option. The plain language of this section simply sets the face value of the bond based on the

minimum contract price. It does not provide for the termination of the bond once this minimum price is exceeded.[6]

Capitol's problem in this case appears to have arisen from the use of a standardized government bond form in the context of an indefinite-quantity contract. The bond's provision for "authorized modifications" is not particularly surprising in itself because Miller Act bonds frequently require some amount of uncertainty. *See, e.g.*, *Am. Auto Ins. Co. v. United States ex rel. Luce*, 269 F.2d 406, 409 (1st Cir. 1959)*; United States ex rel. IBM v. Hartford Fire Ins. Co.*, 112 F. Supp. 2d 1023, 1031 (D. Haw. 2000). The Surety Association of America as amicus curiae notes, however, that indefinite-quantity contracts are being utilized with increasing frequency and can subject sureties to unforseen levels of risk when the contract exceeds the minimum guaranteed price. Even though the monetary liability of the surety does not increase as long as the face value of the bond remains constant, additional work beyond the guaranteed minimum increases the chances of a default and thus the level of risk undertaken by the surety. Recent amendments to the Federal Acquisition Regulations address this problem

---

[6] In addition, Capitol's interpretation of this section is not the most natural reading of the contract. The $713,000 guaranteed minimum was the minimum price of services and materials payable to PMR on the primary contract, not the minimum amount payable to Cortez under the subcontract. If the parties had intended to link Cortez's level of protection on the subcontract to the amount paid to PMR on the primary contract, they could easily have included language to that effect.

by requiring the government to obtain additional bonding when the minimum price in an indefinite-quantity contract is exceeded. 48 C.F.R. § 28.102-2(d). Because these amendments were enacted after the present bond was executed, however, they do not affect this litigation.

In anticipation of this court holding the terms of the bond to be ambiguous, both parties have submitted extrinsic evidence that they introduced at trial in support of their respective interpretations of the bond's language. When a contract is unambiguous, however, resort to extrinsic evidence is inappropriate. *Homestake-Sapin Partners*, 375 F.2d at 511. This court holds, as a matter of law, that the bond unambiguously covers increases in the value of the contract during the base period and during each of the option years. The judgment of the district court concluded otherwise and must therefore be reversed.

**B.    Capitol's Cross-Appeal**

The district court rejected Capitol's alternative defense that Cortez was a joint venturer with PMR and was therefore ineligible for bonding protection under the Miller Act. The court erred, however, in ruling against the joint venture defense without first hearing the arguments of both parties. *See Michael A. Cramer, MAI, SRPA, Inc. v. United States*, 47 F.3d 379, 384 (10th Cir. 1995) (holding that the district court abused its discretion by denying a party the chance to present evidence on a claim for litigation costs and then relying on the sparsity

of the record to reject the claim). Although the court based its decision on a lack of any evidence that Cortez and PMR were engaged in a joint venture, it terminated the trial before Capitol had a chance to develop the record on that issue. Cortez's citation to evidence that it argues is sufficient to support the court's judgment is unavailing because Capitol was never allowed to present evidence to the contrary. The court's conclusions of law rejecting the joint venture defense therefore must also be reversed.

## IV. CONCLUSION

For the foregoing reasons, this court **reverses** the judgment of the district court and **remands** for further proceedings consistent with this order and judgment.

ENTERED FOR THE COURT


Michael R. Murphy
Circuit Judge

-15-